# Turner *v.* State.

## (*Nashville,* December Term, 1936.)

Opinion filed January 18, 1937.

Gus A. Wood, Jr., of Chattanooga, for plaintiff in error.

W. F. Barry, Jr., Assistant Attorney-General, for defendant in error.

Mr. Justice DeHaven delivered the opinion of the Court.

Plaintiff in error, M. A. Turner, Jr., hereinafter referred to as defendant, was indicted in the criminal court of Hamilton county for violation of the State Pure Food Law by mixing a certain deleterious ingredient with meat and sausage offered and exposed for sale. On his trial, the jury found the defendant guilty and fixed his punishment at a fine of $75. From a judgment in accordance with the verdict, defendant has appealed to this court and assigned errors.

The first six assignments of error are, in effect, that there is no evidence to support the verdict of the jury, and that the evidence preponderates in favor of the innocence of defendant.

It is shown in the proof that M. A. Turner, Sr., the father of defendant, is the owner of a large meat market in the city of Chattanooga. The defendant had been in the employ of his father at this market some nine or ten years, and was in active charge of the market at the time an inspection was made by a representative of the Pure Food Division of the State Department of Agriculture. It is admitted that when his father is not present the defendant is in charge of the business.

On or about November 18, 1935, a representative of the Pure Food Division went to the Turner meat-market, in the absence of M. A. Turner, Sr., and while defendant was in charge of the business, and took samples of sausage and hamburger. These samples were sent to the laboratory of the Department of Agriculture at Nashville. In due course the hamburger meat and sausage were analyzed by two state chemists, Drs. E. H. Holman and V. L. Fuqua. Both testified on the trial that the hamburger and sausage contained sodium sulphite, a preservative. The amount of sodium sulphite found in the samples was equal to about one-eighth of a teaspoonful, sufficient to be deleterious to health. The effect of sodium sulphite on meat is to give it a fresh appearance, preserve it, and keep it from spoiling. The most damaging effect of sulphite on the human body is to the kidneys, and may cause hardening of the arteries and, in some cases, abortion.

It is shown in the proof offered by defendant that a product called ''Freeze-em-Pickle,'' and also know as ''Preservolene,'' was regularly used in this butcher shop. The sales manager of the manufacturer of this product gave a deposition, which was read in evidence, in which he asserted ''Freeze-em-Pickle'' was a curing agent and

was not sold as a preservative. He denied that it contained sulphite, but refused to disclose its chemical contents on the ground that it was a secret formula and confidential. He denied that the compound was injurious to health, unless used to excess.

Defendant testified that "Freeze-em-Pickle" came as a preservative, and Turner, Sr., refers to it as a preservative and says they called the compound "Preservolene." Under this name Dr. Fuqua got a package of the compound from a butcher shop and an analysis showed sulphite as a part of its contents.

■ The controlling fact, however, was that sulphite was found in the sausage and hamburger analyzed by the chemists. Whether sulphite was present in "Freeze-em-Pickle" or was independently mixed with the meat is immaterial. Sulphite was found in the sample taken, and that is sufficient.

■ It is further insisted that the proof fails to show that defendant had anything to do with putting the alleged unlawful preservative in the meat, or that he was personally guilty of selling, or exposing for sale, the meat containing the unlawful preservative. It appears that defendant was manager and in the active charge of the market at the time when the inspection was made and at the time of his arrest. He directed the officer to place his name on the warrant when the arrest for this misdemeanor was made. Section 6588 of the Code provides:

"When construing and enforcing the provisions of this chapter, the act, omission, or failure of any officer, agent, or other person acting for or employed by any corporation, company, society or association within the scope of his employment or office shall in every case be also deemed to be the act, omission, or failure of such cor-

poration, company, society, or association, as well as that of the person.''

We do not think that because defendant was in active charge of the market only when his father was absent, and that he worked on a salary, can be held to exclude him from liability under the act.

The first six assignments must be overruled.

■ ■ The seventh assignment of error is, in substance, that the court erred in failing to charge the jury on the law of circumstantial evidence. Defendant made no special request that such law be given to the jury. Furthermore, we fail to see where the law of circumstantial evidence had any place in the case. This assignment must be overruled.

■ Under the eighth assignment it is alleged that the uncontradicted evidence in the record shows that the preservative used was guaranteed in accordance with the provisions of the National Pure Food and Drug Act as amended (21 U. S. C. A., secs. 1-5, 7-15), and that defendant had never received written notice from the pure food and drug inspector that the article in question was adulterated or misbranded. This assignment is predicated upon Code, section 6586, which is as follows:

''No dealer shall be prosecuted under the provisions of this chapter when he can establish a guaranty in accordance with the provisions of the national pure food and drugs act, or a guaranty signed by the wholesaler, jobber, manufacturer, or other parties residing in this state from whom he purchases such articles to the effect that same is not adulterated or misbranded within the meaning of this chapter designating it. Said guaranty, to afford protection, shall contain the name and address of the person making the sales of such articles to such

dealer, and in such case said person shall be amenable to the prosecutions, fines, and other penalties which would attach in due course to the dealer under the provisions of this chapter; provided, that a guaranty shall not exempt any dealer from prosecution if such dealer shall continue to sell any article (1) after having received written notice from the pure food and drug inspector that the article in question is adulterated or misbranded within the meaning of this chapter; or (2) if he shall continue to sell such article ten days after advertisement regarding it, as provided in the next section following.''

The effect of this section is to protect the retailer from prosecution where the wholesaler, jobber, or manufacturer has sold him adulterated or misbranded food or drugs. It was shown by the manufacturer's sales manager that ''Freeze-em-Pickle'' is guaranteed by the manufacturer to comply with all the provisions of the National Pure Food and Drugs Act and with the regulations of the United States Department of Agriculture, and that it is in general use throughout the United States. It is not shown in what sort of container this product reached defendant, or that any unbroken package of this product was sold to defendant or his father, or that the product used was purchased from the manufacturer.

As heretofore pointed out, if ''Freeze-em-Pickle'' contained no sulphite, then it must be true that sulphite was added to it, or that sulphite was independently used, in preserving meats at this market, because the uncontradicted proof is that sulphite was found in the samples of meat by the state chemists. Defendant was not charged with using ''Freeze-em-Pickle,'' but was charged with

using a deleterious ingredient with meat and sausage, which on the trial was shown to be sulphite.

After a careful consideration of all the assignments of error, we are constrained to overrule the same. The result is that the judgment of the trial court must be affirmed.