# UNITED STATES *v.* PARK

No. 74–215. Argued March 18–19, 1975—Decided June 9, 1975

BURGER, C. J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. STEWART, J., filed a dissenting opinion, in which MARSHALL and POWELL, JJ., joined, *post,* p. 678.

*Allan Abbott Tuttle* argued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Kauper, Howard E. Shapiro,* and *Peter Barton Hutt.*

*Gregory M. Harvey* argued the cause for respondent. With him on the brief was *Orvel Sebring.**

---

*Briefs of *amici curiae* urging affirmance were filed by *James F. Rill, Robert A. Collier,* and *John Hardin Young* for the National Association of Food Chains; by *H. Thomas Austern, H. Edward Dunkelberger, Jr.,* and *Geoffrey Richard Wagner Smith* for the

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted certiorari to consider whether the jury instructions in the prosecution of a corporate officer under § 301 (k) of the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1042, as amended, 21 U. S. C. § 331 (k), were appropriate under *United States* v. *Dotterweich,* 320 U. S. 277 (1943).

Acme Markets, Inc., is a national retail food chain with approximately 36,000 employees, 874 retail outlets, 12 general warehouses, and four special warehouses. Its headquarters, including the office of the president, respondent Park, who is chief executive officer of the corporation, are located in Philadelphia, Pa. In a five-count information filed in the United States District Court for the District of Maryland, the Government charged Acme and respondent with violations of the Federal Food, Drug, and Cosmetic Act. Each count of the information alleged that the defendants had received food that had been shipped in interstate commerce and that, while the food was being held for sale in Acme's Baltimore warehouse following shipment in interstate commerce, they caused it to be held in a building accessible to rodents and to be exposed to contamination by rodents. These acts were alleged to have resulted in the food's being adulterated within the meaning of 21 U. S. C. §§ 342 (a)(3) and (4),[1] in violation of 21 U. S. C. § 331 (k).[2]

---

National Canners Assn.; by *Robert C. Barnard* and *Charles F. Lettow* for the Synthetic Organic Chemical Manufacturers Assn.; and by *Frederick M. Rowe, Paul M. Hyman,* and *Jonathan W. Sloat* for the Grocery Manufacturers of America, Inc.

[1] Section 402 of the Act, 21 U. S. C. § 342, provides in pertinent part:

"A food shall be deemed to be adulterated—

"(a) ... (3) if it consists in whole or in part of any filthy, putrid,

Acme pleaded guilty to each count of the information. Respondent pleaded not guilty. The evidence at trial [3] demonstrated that in April 1970 the Food and Drug Administration (FDA) advised respondent by letter of insanitary conditions in Acme's Philadelphia warehouse. In 1971 the FDA found that similar conditions existed in the firm's Baltimore warehouse. An FDA consumer safety officer testified concerning evidence of rodent infestation and other insanitary conditions discovered during a 12-day inspection of the Baltimore warehouse in November and December 1971.[4] He also related that a

---

or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health . . . ."

[2] Section 301 of the Act, 21 U. S. C. § 331, provides in pertinent part:

"The following acts and the causing thereof are prohibited:

.        .        .        .        .

"(k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

[3] The parties stipulated in effect that the items of food described in the information had been shipped in interstate commerce and were being held for sale in Acme's Baltimore warehouse.

[4] The witness testified with respect to the inspection of the basement of the "old building" in the warehouse complex:

"We found extensive evidence of rodent infestation in the form of rat and mouse pellets throughout the entire perimeter area and along the wall.

"We also found that the doors leading to the basement area from the rail siding had openings at the bottom or openings beneath part of the door that came down at the bottom large enough to admit rodent entry. There were also roden[t] pellets found on a number of different packages of boxes of various items stored in the base-

second inspection of the warehouse had been conducted in March 1972.[5] On that occasion the inspectors found that there had been improvement in the sanitary conditions, but that "there was still evidence of rodent activity in the building and in the warehouses and we found some rodent-contaminated lots of food items." App. 23.

The Government also presented testimony by the Chief of Compliance of the FDA's Baltimore office, who informed respondent by letter of the conditions at the Baltimore warehouse after the first inspection.[6] There was testimony by Acme's Baltimore division vice president, who had responded to the letter on behalf of Acme and respondent and who described the steps taken to remedy the insanitary conditions discovered by both inspections. The Government's final witness, Acme's vice president for legal affairs and assistant secretary, identi-

---

ment, and looking at this document, I see there were also broken windows along the rail siding." App. 20–21.

On the first floor of the "old building," the inspectors found:

"Thirty mouse pellets on the floor along walls and on the ledge in the hanging meat room. There were at least twenty mouse pellets beside bales of lime Jello and one of the bales had a chewed rodent hole in the product. . . ." *Id.*, at 22.

[5] The first four counts of the information alleged violations corresponding to the observations of the inspectors during the November and December 1971 inspection. The fifth count alleged violations corresponding to observations during the March 1972 inspection.

[6] The letter, dated January 27, 1972, included the following:

"We note with much concern that the old and new warehouse areas used for food storage were actively and extensively inhabited by live rodents. Of even more concern was the observation that such reprehensible conditions obviously existed for a prolonged period of time without any detection, or were completely ignored . . . .

"We trust this letter will serve to direct your attention to the seriousness of the problem and formally advise you of the urgent need to initiate whatever measures are necessary to prevent recurrence and ensure compliance with the law." *Id.*, at 64–65.

fied respondent as the president and chief executive officer of the company and read a bylaw prescribing the duties of the chief executive officer.[7] He testified that respondent functioned by delegating "normal operating duties," including sanitation, but that he retained "certain things, which are the big, broad, principles of the operation of the company," and had "the responsibility of seeing that they all work together." *Id.*, at 41.

At the close of the Government's case in chief, respondent moved for a judgment of acquittal on the ground that "the evidence in chief has shown that Mr. Park is not personally concerned in this Food and Drug violation." The trial judge denied the motion, stating that *United States* v. *Dotterweich,* 320 U. S. 277 (1943), was controlling.

Respondent was the only defense witness. He testified that, although all of Acme's employees were in a sense under his general direction, the company had an "organizational structure for responsibilities for certain functions" according to which different phases of its operation were "assigned to individuals who, in turn, have staff and departments under them." He identified those individuals responsible for sanitation, and related that upon receipt of the January 1972 FDA letter, he had conferred with the vice president for legal affairs,

---

[7] The bylaw provided in pertinent part:

"The Chairman of the board of directors or the president shall be the chief executive officer of the company as the board of directors may from time to time determine. He shall, subject to the board of directors, have general and active supervision of the affairs, business, offices and employees of the company. . . .

"He shall, from time to time, in his discretion or at the order of the board, report the operations and affairs of the company. He shall also perform such other duties and have such other powers as may be assigned to him from time to time by the board of directors." *Id.*, at 40.

who informed him that the Baltimore division vice president "was investigating the situation immediately and would be taking corrective action and would be preparing a summary of the corrective action to reply to the letter." Respondent stated that he did not "believe there was anything [he] could have done more constructively than what [he] found was being done." App. 43–47.

On cross-examination, respondent conceded that providing sanitary conditions for food offered for sale to the public was something that he was "responsible for in the entire operation of the company," and he stated that it was one of many phases of the company that he assigned to "dependable subordinates." Respondent was asked about and, over the objections of his counsel, admitted receiving, the April 1970 letter addressed to him from the FDA regarding insanitary conditions at Acme's Philadelphia warehouse.[8] He acknowledged that, with the exception of the division vice president, the same individuals had responsibility for sanitation in both Baltimore and Philadelphia. Finally, in response to questions concerning the Philadelphia and Baltimore incidents, respondent admitted that the Baltimore problem indicated the system for handling sanitation "wasn't

---

[8] The April 1970 letter informed respondent of the following "objectionable conditions" in Acme's Philadelphia warehouse:

"1. Potential rodent entry ways were noted via ill fitting doors and door in irrepair at Southwest corner of warehouse; at dock at old salvage room and at receiving and shipping doors which were observed to be open most of the time.

"2. Rodent nesting, rodent excreta pellets, rodent stained bale bagging and rodent gnawed holes were noted among bales of flour stored in warehouse.

"3. Potential rodent harborage was noted in discarded paper, rope, sawdust and other debris piled in corner of shipping and receiving dock near bakery and warehouse doors. Rodent excreta pellets were observed among bags of sawdust (or wood shavings)." Id., at 70.

working perfectly" and that as Acme's chief executive officer he was responsible for "any result which occurs in our company." *Id.*, at 48–55.

At the close of the evidence, respondent's renewed motion for a judgment of acquittal was denied. The relevant portion of the trial judge's instructions to the jury challenged by respondent is set out in the margin.[9] Respondent's counsel objected to the instructions on the ground that they failed fairly to reflect our decision in *United States* v. *Dotterweich, supra,* and to define " 'responsible relationship.' " The trial judge over-

---

[9] "In order to find the Defendant guilty on any count of the Information, you must find beyond a reasonable doubt on each count . . . .

.        .        .        .        .

"Thirdly, that John R. Park held a position of authority in the operation of the business of Acme Markets, Incorporated.

"However, you need not concern yourselves with the first two elements of the case. The main issue for your determination is only with the third element, whether the Defendant held a position of authority and responsibility in the business of Acme Markets.

.        .        .        .        .

"The statute makes individuals, as well as corporations, liable for violations. An individual is liable if it is clear, beyond a reasonable doubt, that the elements of the adulteration of the food as to travel in interstate commerce are present. As I have instructed you in this case, they are, and that the individual had a responsible relation to the situation, even though he may not have participated personally.

"The individual is or could be liable under the statute, even if he did not consciously do wrong. However, the fact that the Defendant is pres[id]ent and is a chief executive officer of the Acme Markets does not require a finding of guilt. Though, he need not have personally participated in the situation, he must have had a responsible relationship to the issue. The issue is, in this case, whether the Defendant, John R. Park, by virtue of his position in the company, had a position of authority and responsibility in the situation out of which these charges arose." *Id.*, at 61–62.

ruled the objection. The jury found respondent guilty on all counts of the information, and he was subsequently sentenced to pay a fine of $50 on each count.[10]

The Court of Appeals reversed the conviction and remanded for a new trial. That court viewed the Government as arguing "that the conviction may be predicated solely upon a showing that . . . [respondent] was the President of the offending corporation," and it stated that as "a general proposition, some act of commission or omission is an essential element of every crime." 499 F. 2d 839, 841 (CA4 1974). It reasoned that, although our decision in *United States* v. *Dotterweich, supra,* at 281, had construed the statutory provisions under which respondent was tried to dispense with the traditional element of " 'awareness of some wrongdoing,' " the Court had not construed them as dispensing with the element of "wrongful action." The Court of Appeals concluded that the trial judge's instructions "might well have left the jury with the erroneous impression that Park could be found guilty in the absence of 'wrongful action' on his part," 499 F. 2d, at 841–842, and that proof of this element was required by due process. It held, with one

---

[10] Sections 303 (a) and (b) of the Act, 21 U. S. C. §§ 333 (a) and (b), provide:

"(a) Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both.

"(b) Notwithstanding the provisions of subsection (a) of this section, if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both."

Respondent's renewed motion for a judgment of acquittal or in the alternative for a new trial, one of the grounds of which was the alleged abuse of discretion in the initiation of the prosecution against him, had previously been denied after argument.

dissent, that the instructions did not "correctly state the law of the case," *id.,* at 840, and directed that on retrial the jury be instructed as to "wrongful action," which might be "gross negligence and inattention in discharging . . . corporate duties and obligations or any of a host of other acts of commission or omission which would 'cause' the contamination of food." *Id.,* at 842. (Footnotes omitted.)

The Court of Appeals also held that the admission in evidence of the April 1970 FDA warning to respondent was error warranting reversal, based on its conclusion that, "as this case was submitted to the jury and in light of the sole issue presented," there was no need for the evidence and thus that its prejudicial effect outweighed its relevancy under the test of *United States* v. *Woods,* 484 F. 2d 127 (CA4 1973), cert. denied, 415 U. S. 979 (1974). 499 F. 2d, at 843.

We granted certiorari because of an apparent conflict among the Courts of Appeals with respect to the standard of liability of corporate officers under the Federal Food, Drug, and Cosmetic Act as construed in *United States* v. *Dotterweich, supra,* and because of the importance of the question to the Government's enforcement program. We reverse.

I

The question presented by the Government's petition for certiorari in *United States* v. *Dotterweich, supra,* and the focus of this Court's opinion, was whether "the manager of a corporation, as well as the corporation itself, may be prosecuted under the Federal Food, Drug, and Cosmetic Act of 1938 for the introduction of misbranded and adulterated articles into interstate commerce." Pet. for Cert., No. 5, O. T. 1943, p. 2. In *Dotterweich,* a jury had disagreed as to the corporation, a jobber purchasing drugs from manu-

facturers and shipping them in interstate commerce under its own label, but had convicted Dotterweich, the corporation's president and general manager. The Court of Appeals reversed the conviction on the ground that only the drug dealer, whether corporation or individual, was subject to the criminal provisions of the Act, and that where the dealer was a corporation, an individual connected therewith might be held personally only if he was operating the corporation "as his 'alter ego.' " *United States* v. *Buffalo Pharmacal Co.,* 131 F. 2d 500, 503 (CA2 1942).[11]

In reversing the judgment of the Court of Appeals and reinstating Dotterweich's conviction, this Court looked to the purposes of the Act and noted that they "touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." 320 U. S., at 280. It observed that the Act is of "a now familiar type" which "dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." *Id.,* at 280–281.

Central to the Court's conclusion that individuals other than proprietors are subject to the criminal provisions of the Act was the reality that "the only way in which a corporation can act is through the individuals who act on its behalf." *Id.,* at 281. The Court

---

[11] The Court of Appeals relied upon § 303 (c) of the Act, 21 U. S. C. § 333 (c), which extended immunity from the penalties provided by § 303 (a) to a person who could establish a guaranty "signed by, and containing the name and address of, the person residing in the United States *from whom he received* in good faith the article . . . ."* (Emphasis added.) The court reasoned that where the drug dealer was a corporation, the protection of § 303 (c) would extend only to such dealer and not to its employees.

also noted that corporate officers had been subject to criminal liability under the Federal Food and Drugs Act of 1906,[12] and it observed that a contrary result under the 1938 legislation would be incompatible with the expressed intent of Congress to "enlarge and stiffen the penal net" and to discourage a view of the Act's criminal penalties as a " 'license fee for the conduct of an illegitimate business.' " 320 U. S., at 282–283. (Footnote omitted.)

At the same time, however, the Court was aware of the concern which was the motivating factor in the Court of Appeals' decision, that literal enforcement "might operate too harshly by sweeping within its condemnation any person however remotely entangled in the proscribed shipment." *Id.,* at 284. A limiting principle, in the form of "settled doctrines of criminal law" defining those who "are responsible for the commission of a misdemeanor," was available. In this context, the Court concluded, those doctrines dictated that the offense was committed "by all who . . . have . . . a responsible share in the furtherance of the transaction which the statute outlaws." *Ibid.*

The Court recognized that, because the Act dispenses with the need to prove "consciousness of wrongdoing," it may result in hardship even as applied to those who share "responsibility in the business process resulting in" a violation. It regarded as "too treacherous" an attempt "to define or even to indicate by way of illustration the class of employees which stands in such a responsible relation." The question of responsibility, the Court said, depends "on the evidence produced at the trial and its submission—assuming the evidence warrants it—to the jury under appropriate guidance." The Court added: "In such matters the good sense of prosecutors, the wise guidance of trial judges, and the ulti-

---

[12] Act of June 30, 1906, c. 3915, 34 Stat. 768.

mate judgment of juries must be trusted." *Id.*, at 284–285.[13] See 21 U. S. C. § 336. Cf. *United States* v. *Sullivan*, 332 U. S. 689, 694–695 (1948).

## II

The rule that corporate employees who have "a responsible share in the furtherance of the transaction which the statute outlaws" are subject to the criminal provisions of the Act was not formulated in a vacuum. Cf. *Morissette* v. *United States*, 342 U. S. 246, 258 (1952). Cases under the Federal Food and Drugs Act of 1906 reflected the view both that knowledge or intent were not required to be proved in prosecutions under its criminal provisions, and that responsible corporate agents could be subjected to the liability thereby imposed. See, *e. g., United States* v. *Mayfield*, 177 F. 765 (ND Ala. 1910). Moreover, the principle had been recognized that a corporate agent, through whose act, default, or omission the corporation committed a crime, was himself guilty individually of that crime. The principle had been applied whether or not the crime required "consciousness of wrongdoing," and it had been applied not only to those corporate agents who themselves committed the criminal act, but also to those who by virtue of their managerial positions or other similar relation to the actor could be deemed responsible for its commission.

In the latter class of cases, the liability of managerial officers did not depend on their knowledge of, or personal participation in, the act made criminal by the statute.

---

[13] In reinstating Dotterweich's conviction, the Court stated: "For present purpose it suffices to say that in what the defense characterized as 'a very fair charge' the District Court properly left the question of the responsibility of Dotterweich for the shipment to the jury, and there was sufficient evidence to support its verdict." 320 U. S., at 285.

Rather, where the statute under which they were prosecuted dispensed with "consciousness of wrongdoing," an omission or failure to act was deemed a sufficient basis for a responsible corporate agent's liability. It was enough in such cases that, by virtue of the relationship he bore to the corporation, the agent had the power to prevent the act complained of. See, *e. g., State* v. *Burnam,* 71 Wash. 199, 128 P. 218 (1912); *Overland Cotton Mill Co.* v. *People,* 32 Colo. 263, 75 P. 924 (1904). Cf. *Groff* v. *State,* 171 Ind. 547, 85 N. E. 769 (1908); *Turner* v. *State,* 171 Tenn. 36, 100 S. W. 2d 236 (1937); *People* v. *Schwartz,* 28 Cal. App. 2d 775, 70 P. 2d 1017 (1937); Sayre, Criminal Responsibility for the Acts of Another, 43 Harv. L. Rev. 689 (1930).

The rationale of the interpretation given the Act in *Dotterweich,* as holding criminally accountable the persons whose failure to exercise the authority and supervisory responsibility reposed in them by the business organization resulted in the violation complained of, has been confirmed in our subsequent cases. Thus, the Court has reaffirmed the proposition that "the public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors." *Smith* v. *California,* 361 U. S. 147, 152 (1959). In order to make "distributors of food the strictest censors of their merchandise," *ibid.,* the Act punishes "neglect where the law requires care, or inaction where it imposes a duty." *Morissette* v. *United States, supra,* at 255. "The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." *Id.,* at 256. Cf. Hughes, Criminal Omissions, 67 Yale L. J. 590 (1958). Similarly, in cases decided after *Dotterweich,* the

Courts of Appeals have recognized that those corporate agents vested with the responsibility, and power commensurate with that responsibility, to devise whatever measures are necessary to ensure compliance with the Act bear a "responsible relationship" to, or have a "responsible share" in, violations.[14]

Thus *Dotterweich* and the cases which have followed reveal that in providing sanctions which reach and touch the individuals who execute the corporate mission—and this is by no means necessarily confined to a single corporate agent or employee—the Act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur. The requirements of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them. Cf. Wasserstrom, Strict Liability in the Criminal Law, 12 Stan. L. Rev. 731, 741–745 (1960).[15]

The Act does not, as we observed in *Dotterweich*, make criminal liability turn on "awareness of some wrong-

---

[14] See, *e. g., Lelles* v. *United States,* 241 F. 2d 21 (CA9), cert. denied, 353 U. S. 974 (1957); *United States* v. *Kaadt,* 171 F. 2d 600 (CA7 1948). Cf. *United States* v. *Shapiro,* 491 F. 2d 335, 337 (CA6 1974); *United States* v. *3963 Bottles,* 265 F. 2d 332 (CA7), cert. denied, 360 U. S. 931 (1959); *United States* v. *Klehman,* 397 F. 2d 406 (CA7 1968).

[15] We note that in 1948 the Senate passed an amendment to § 303 (a) of the Act to impose criminal liability only for violations committed "willfully or as a result of gross negligence." 94 Cong. Rec. 6760–6761 (1948). However, the amendment was subsequently stricken in conference. *Id.,* at 8551, 8838.

doing" or "conscious fraud." The duty imposed by Congress on responsible corporate agents is, we emphasize, one that requires the highest standard of foresight and vigilance, but the Act, in its criminal aspect, does not require that which is objectively impossible. The theory upon which responsible corporate agents are held criminally accountable for "causing" violations of the Act permits a claim that a defendant was "powerless" to prevent or correct the violation to "be raised defensively at a trial on the merits." *United States* v. *Wiesenfeld Warehouse Co.*, 376 U. S. 86, 91 (1964). If such a claim is made, the defendant has the burden of coming forward with evidence, but this does not alter the Government's ultimate burden of proving beyond a reasonable doubt the defendant's guilt, including his power, in light of the duty imposed by the Act, to prevent or correct the prohibited condition. Congress has seen fit to enforce the accountability of responsible corporate agents dealing with products which may affect the health of consumers by penal sanctions cast in rigorous terms, and the obligation of the courts is to give them effect so long as they do not violate the Constitution.

## III

We cannot agree with the Court of Appeals that it was incumbent upon the District Court to instruct the jury that the Government had the burden of establishing "wrongful action" in the sense in which the Court of Appeals used that phrase. The concept of a "responsible relationship" to, or a "responsible share" in, a violation of the Act indeed imports some measure of blameworthiness; but it is equally clear that the Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the

corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so. The failure thus to fulfill the duty imposed by the interaction of the corporate agent's authority and the statute furnishes a sufficient causal link. The considerations which prompted the imposition of this duty, and the scope of the duty, provide the measure of culpability.

Turning to the jury charge in this case, it is of course arguable that isolated parts can be read as intimating that a finding of guilt could be predicated solely on respondent's corporate position. But this is not the way we review jury instructions, because "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp* v. *Naughten,* 414 U. S. 141, 146–147 (1973). See *Boyd* v. *United States,* 271 U. S. 104, 107 (1926).

Reading the entire charge satisfies us that the jury's attention was adequately focused on the issue of respondent's authority with respect to the conditions that formed the basis of the alleged violations. Viewed as a whole, the charge did not permit the jury to find guilt solely on the basis of respondent's position in the corporation; rather, it fairly advised the jury that to find guilt it must find respondent "had a responsible relation to the situation," and "by virtue of his position ... had ... authority and responsibility" to deal with the situation. The situation referred to could only be "food ... held in unsanitary conditions in a warehouse with the result that it consisted, in part, of filth or ... may have been contaminated with filth."

Moreover, in reviewing jury instructions, our task is also to view the charge itself as part of the whole trial. "Often isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered

in the context of the entire record of the *trial.*" *United States* v. *Birnbaum,* 373 F. 2d 250, 257 (CA2), cert. denied, 389 U. S. 837 (1967). (Emphasis added.) Cf. *Cupp* v. *Naughten, supra.* The record in this case reveals that the jury could not have failed to be aware that the main issue for determination was not respondent's position in the corporate hierarchy, but rather his accountability, because of the responsibility and authority of his position, for the conditions which gave rise to the charges against him.[16]

We conclude that, viewed as a whole and in the context of the trial, the charge was not misleading and contained an adequate statement of the law to guide the jury's determination. Although it would have been better to give an instruction more precisely relating the legal issue to the facts of the case, we cannot say that the failure to provide the amplification requested by respondent was an abuse of discretion. See *United*

---

[16] In his summation to the jury, the prosecutor argued:

"That brings us to the third question that you must decide, and that is whether Mr. John R. Park is responsible for the conditions persisting. . . .

. . . . .

"The point is that, while Mr. Park apparently had a system, and I think he testified the system had been set up long before he got there—he did say that if anyone was going to change the system, it was his responsibility to do so. That very system, the system that he didn't change, did not work in March of 1970 in Philadelphia; it did not work in November of 1971 in Baltimore; it did not work in March of 1972 in Baltimore, and under those circumstances, I submit, that Mr. Park is the man responsible. . . .

. . . . .

"Mr. Park was responsible for seeing that sanitation was taken care of, and he had a system set up that was supposed to do that. This system didn't work. It didn't work three times. At some point in time, Mr. Park has to be held responsible for the fact that his system isn't working . . . ." App. 57, 59, 60.

*States* v. *Bayer,* 331 U. S. 532, 536–537 (1947); *Holland* v. *United States,* 348 U. S. 121, 140 (1954). Finally, we note that there was no request for an instruction that the Government was required to prove beyond a reasonable doubt that respondent was not without the power or capacity to affect the conditions which founded the charges in the information.[17] In light of the evidence adduced at trial, we find no basis to conclude that the failure of the trial court to give such an instruction *sua sponte* was plain error or a defect affecting substantial rights. Fed. Rule Crim. Proc. 52 (b). Compare *Lopez* v. *United States,* 373 U. S. 427, 436 (1963), with *Screws* v. *United States,* 325 U. S. 91, 107 (1945) (opinion of Douglas, J.).

## IV

Our conclusion that the Court of Appeals erred in its reading of the jury charge suggests as well our disagreement with that court concerning the admissibility of evidence demonstrating that respondent was advised by the FDA in 1970 of insanitary conditions in Acme's Philadelphia warehouse. We are satisfied that the Act imposes the highest standard of care and permits conviction of responsible corporate officials who, in light of this standard of care, have the power to prevent or correct violations of its provisions. Implicit in the Court's admonition that "the ultimate judgment of juries must be trusted," *United States* v. *Dotterweich,* 320 U. S., at 285, however, is the realization that they may demand more than corporate bylaws to find culpability.

---

[17] Counsel for respondent submitted only two requests for charge: (1) "Statutes such as the ones the Government seeks to apply here are criminal statutes and should be strictly construed," and (2) "The fact that John Park is President and Chief Executive Officer of Acme Markets, Inc. does not of itself justify a finding of guilty under Counts I through V of the Information." 1 Record 56–57.

Respondent testified in his defense that he had employed a system in which he relied upon his subordinates, and that he was ultimately responsible for this system. He testified further that he had found these subordinates to be "dependable" and had "great confidence" in them. By this and other testimony respondent evidently sought to persuade the jury that, as the president of a large corporation, he had no choice but to delegate duties to those in whom he reposed confidence, that he had no reason to suspect his subordinates were failing to insure compliance with the Act, and that, once violations were unearthed, acting through those subordinates he did everything possible to correct them.[18]

Although we need not decide whether this testimony would have entitled respondent to an instruction as to his lack of power, see *supra*, at 676, had he requested it,[19] the testimony clearly created the "need" for rebuttal evidence. That evidence was not offered to show that respondent had a propensity to commit criminal acts, cf. *Michelson* v. *United States*, 335 U. S. 469, 475–476 (1948), or, as in *United States* v. *Woods*, 484 F. 2d 127, that the crime charged had been committed; its purpose

---

[18] In his summation to the jury, counsel for respondent argued:

"Now, you are Mr. Park. You have his responsibility for a thousand stores—I think eight hundred and some stores—lots of stores, many divisions, many warehouses. What are you going to do, except hire people in whom you have confidence to whom you delegate the work? . . .

. . . . .

". . . What I am saying to you is that Mr. Park, through his subordinates, when this was found out, did everything in the world they [*sic*] could." 3 Record 201, 207.

[19] Assuming, *arguendo*, that it would be objectively impossible for a senior corporate agent to control fully day-to-day conditions in 874 retail outlets, it does not follow that such a corporate agent could not prevent or remedy promptly violations of elementary sanitary conditions in 16 regional warehouses.

was to demonstrate that respondent was on notice that he could not rely on his system of delegation to subordinates to prevent or correct insanitary conditions at Acme's warehouses, and that he must have been aware of the deficiencies of this system before the Baltimore violations were discovered. The evidence was therefore relevant since it served to rebut respondent's defense that he had justifiably relied upon subordinates to handle sanitation matters. Cf. *United States* v. *Ross,* 321 F. 2d 61, 67 (CA2), cert. denied, 375 U. S. 894 (1963); E. Cleary, McCormick on Evidence § 190, pp. 450–452 (2d ed. 1972). And, particularly in light of the difficult task of juries in prosecutions under the Act, we conclude that its relevance and persuasiveness outweighed any prejudicial effect. Cf. *Research Laboratories, Inc.* v. *United States,* 167 F. 2d 410, 420–421 (CA9), cert. denied, 335 U. S. 843 (1948).

*Reversed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE MARSHALL and MR. JUSTICE POWELL join, dissenting.

Although agreeing with much of what is said in the Court's opinion, I dissent from the opinion and judgment, because the jury instructions in this case were not consistent with the law as the Court today expounds it.

As I understand the Court's opinion, it holds that in order to sustain a conviction under § 301 (k) of the Federal Food, Drug, and Cosmetic Act the prosecution must at least show that by reason of an individual's corporate position and responsibilities, he had a duty to use care to maintain the physical integrity of the corporation's food products. A jury may then draw the inference that when the food is found to be in such condition as to violate the statute's prohibitions, that condition was "caused" by a breach of the standard of care imposed upon the

responsible official. This is the language of negligence, and I agree with it.

To affirm this conviction, however, the Court must approve the instructions given to the members of the jury who were entrusted with determining whether the respondent was innocent or guilty. Those instructions did not conform to the standards that the Court itself sets out today.

The trial judge instructed the jury to find Park guilty if it found beyond a reasonable doubt that Park "had a responsible relation to the situation . . . . The issue is, in this case, whether the Defendant, John R. Park, by virtue of his position in the company, had a position of authority and responsibility in the situation out of which these charges arose." Requiring, as it did, a verdict of guilty upon a finding of "responsibility," this instruction standing alone could have been construed as a direction to convict if the jury found Park "responsible" for the condition in the sense that his position as chief executive officer gave him formal responsibility within the structure of the corporation. But the trial judge went on specifically to caution the jury not to attach such a meaning to his instruction, saying that "the fact that the Defendant is pres[id]ent and is a chief executive officer of the Acme Markets does not require a finding of guilt." "Responsibility" as used by the trial judge therefore had whatever meaning the jury in its unguided discretion chose to give it.

The instructions, therefore, expressed nothing more than a tautology. They told the jury: "You must find the defendant guilty if you find that he is to be held accountable for this adulterated food." In other words: "You must find the defendant guilty if you conclude that he is guilty." The trial judge recognized the infirmities in these instructions, but he reluctantly con-

cluded that he was required to give such a charge under *United States* v. *Dotterweich,* 320 U. S. 277, which, he thought, in declining to define "responsible relation" had declined to specify the minimum standard of liability for criminal guilt.[1]

As the Court today recognizes, the *Dotterweich* case did not deal with what kind of conduct must be proved to support a finding of criminal guilt under the Act. *Dotterweich* was concerned, rather, with the statutory definition of "person"—with what kind of corporate employees were even "subject to the criminal provisions of the Act." *Ante,* at 670. The Court held that those employees with "a responsible relation" to the violative transaction or condition were subject to the Act's criminal provisions, but all that the Court had to say with respect to the kind of conduct that can constitute criminal guilt was that the Act "dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing." 320 U. S., at 281.

In approving the instructions to the jury in this case— instructions based upon what the Court concedes was a misunderstanding of *Dotterweich*—the Court approves a conspicuous departure from the long and firmly established division of functions between judge and jury in the administration of criminal justice. As the Court put the matter more than 80 years ago:

"We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries

---

[1] In response to a request for further illumination of what he meant by "responsible relationship" the District Judge said:

"Let me say this, simply as to the definition of the 'responsible relationship.' Dotterweich and subsequent cases have indicated this really is a jury question. It says it is not even subject to being defined by the Court. As I have indicated to counsel, I am quite candid in stating that I do not agree with the decision; therefore, ·I am going to stick by it."

in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence. Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be. Under any other system, the courts, although established in order to declare the law, would for every practical purpose be eliminated from our system of government as instrumentalities devised for the protection equally of society and of individuals in their essential rights. When that occurs our government will cease to be a government of laws, and become a government of men. Liberty regulated by law is the underlying principle of our institutions." *Sparf* v. *United States,* 156 U. S. 51, 102–103.

More recently the Court declared unconstitutional a procedure whereby a jury, having acquitted a defendant of a misdemeanor, was instructed to impose upon him such costs of the prosecution as it deemed appropriate to his degree of "responsibility." *Giaccio* v. *Pennsylvania,* 382 U. S. 399. The state statute under which the procedure was authorized was invalidated because it left "to the jury such broad and unlimited power in imposing costs on acquitted defendants that the jurors must make determinations of the crucial issue upon their own notions of what the law should be instead of what it is." *Id.,* at 403. And in *Jackson* v. *Denno,* 378 U. S. 368, the Court found unconstitutional a procedure whereby a jury was permitted to decide the question of the voluntariness of a confession along with the question of guilt, in part because that procedure permitted the submergence of a question of law, as to which appellate review was constitutionally required, in the general deliberations of a jury.

These cases no more than embody a principle fundamental to our jurisprudence: that a jury is to decide the facts and apply to them the law as explained by the trial judge. Were it otherwise, trial by jury would be no more rational and no more responsive to the accumulated wisdom of the law than trial by ordeal. It is the function of jury instructions, in short, to establish in any trial the objective standards that a jury is to apply as it performs its own function of finding the facts.

To be sure, "the day [is] long past when [courts] . . . parsed instructions and engaged in nice semantic distinctions," *Cool* v. *United States,* 409 U. S. 100, 107 (REHNQUIST, J., dissenting). But this Court has never before abandoned the view that jury instructions must contain a statement of the applicable law sufficiently precise to enable the jury to be guided by something other than its rough notions of social justice. And while it might be argued that the issue before the jury in this case was a "mixed" question of both law and fact, this has never meant that a jury is to be left wholly at sea, without any guidance as to the standard of conduct the law requires. The instructions given by the trial court in this case, it must be emphasized, were a virtual nullity, a mere authorization to convict if the jury thought it appropriate. Such instructions—regardless of the blameworthiness of the defendant's conduct, regardless of the social value of the Food, Drug, and Cosmetic Act, and regardless of the importance of convicting those who violate it—have no place in our jurisprudence.

We deal here with a criminal conviction, not a civil forfeiture. It is true that the crime was but a misdemeanor and the penalty in this case light. But under the statute even a first conviction can result in imprisonment for a year, and a subsequent offense is a felony

carrying a punishment of up to three years in prison.[2] So the standardless conviction approved today can serve in another case tomorrow to support a felony conviction and a substantial prison sentence. However highly the Court may regard the social objectives of the Food, Drug, and Cosmetic Act, that regard cannot serve to justify a criminal conviction so wholly alien to fundamental principles of our law.

The *Dotterweich* case stands for two propositions, and I accept them both. First, "any person" within the meaning of 21 U. S. C. § 333 may include any corporate officer or employee "standing in responsible relation" to a condition or transaction forbidden by the Act. 320 U. S., at 281. Second, a person may be convicted of a criminal offense under the Act even in the absence of "the conventional requirement for criminal conduct— awareness of some wrongdoing." *Ibid.*

But before a person can be convicted of a criminal violation of this Act, a jury must find—and must be clearly instructed that it must find—evidence beyond a reasonable doubt that he engaged in wrongful conduct amounting at least to common-law negligence. There were no such instructions, and clearly, therefore, no such finding in this case.[3]

For these reasons, I cannot join the Court in affirming Park's criminal conviction.

---

[2] See *ante,* at 666 n. 10.

[3] This is not to say that Park might not be found guilty by a properly instructed jury in a new trial. But that, of course, is not the point. "Had the jury convicted on proper instructions it would be the end of the matter. But juries are not bound by what seems inescapable logic to judges." *Morissette* v. *United States,* 342 U. S. 246, 276.