BEAM, Circuit Judge,
dissenting.
Austin (Jack) and Peter DeCoster, entered pleas of guilty because their corporation sold eggs contaminated by a strain of salmonella enteritidis bacteria during a period of time extending “[bjetween about the beginning of 2010 and in or about August 2010.” The government contends that these were federal misdemeanor offenses under 21 U.S.C. § 331(a) and § 333(a)(1). As noted by the district court,[1] they were at the time of the alleged offenses the two ranking corporate officers of Quality Egg, LLC (Quality Egg) — Jack being the trustee of the trust that owned Quality Egg and Peter, his son, being the Chief Operating Officer of this multistate corporate enterprise.
At all relevant times, Quality Egg operated six Iowa farms with 73 barns filled with 5 million laying hens and 24 barns filled with young chicks that had not begun to lay eggs. Quality Egg also had several processing plants where eggs were cleaned, packed, and shipped. Jack also owned several other egg-production companies in the state of Maine where Peter apparently spent part of his working time. Collectively, these were large, diverse, and labor-intensive agricultural operations requiring several levels and areas of management, as well as a substantial number of “hands-on” production workers.
At the outset, it is compelling to discern that the DeCosters’ pleas of guilty and waiver of trial by jury in defense of these criminal misdemeanor charges were substantially cabined by a series of factual and procedural stipulations by the prosecutors and the DeCosters pursuant to Federal Rule of Criminal Procedure 11, all of which were accepted by and binding upon the district court.
The record discloses that salmonella contamination of eggs sold by Quality Egg was the sole basis for adulteration claims under § 331(a) concerning the DeCosters as individuals. Given such factual predicate, the government stipulated that “[t]o date” (April 18, 2014), “the government’s investigation has not identified any personnel employed by or associated with Quality Egg, including the defendants], who had knowledge during the [charged] time frame from January 2010 through August 12, 2010, that eggs sold by Quality Egg were, in fact, contaminated with Salmonella [Enteritidis].” Further, the government conceded that the criminal complaint *640 against the DeCosters as executives of Quality Egg was animated by salmonella-prevention regulations published by the FDA on July 9, 2009, but not placed in force until July 9, 2010, through adoption of an Egg Safety Rule. The government also stipulated that “until adoption of the Egg Safety Rule in July 2010, there was no legal or regulatory requirement” for Quality Egg to comply with these regulations. The record also establishes that, given the state of the art of poultry-sanitation management, egg-safety difficulties, especially involving salmonella contamination, are inherent in such operations.[2]
In short, large numbers of employees and supervisors were needed and employed by Quality Egg in an attempt to avoid problems with this ubiquitous pathogen. Thus, the misdemeanor convictions found and imposed by the district court in response to the DeCosters’ very limited guilty pleas amounted to crimes and sentences based upon almost wholly nonculpa-ble conduct.
On the record and the stipulated facts, it is also clfear that the DeCosters lacked the necessary mens rea or “guilty mind,” that is “[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime,” Mens Rea, Black’s Law Dictionary (10th ed. 2014). This mens rea requirement is especially applicable when the crime, as here, is punished by imprisonment. Although § 333(a)(1) purports to authorize a criminal misdemeanor sentence of “imprison[ment] for not more than one year,” the DeCosters’ presentence motions to preclude any such sentence of imprisonment based upon the vicarious-liability standard the district court applied should have been granted.
The Fifth Amendment Due Process Clause forbids the government from depriving any person of liberty without due process of law. “Freedom from imprisonment-from government custody, detention, or other forms of physical restraint-lies at the heart of the liberty that Clause protects.” Zadvydas v. Davis, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). Such a due process violation as attends the DeCosters’ prison sentence is well illustrated in Staples v. United States, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Under the National Firearms Act, 26 U.S.C. §§ 5801-5872, any fully automatic weapon is a “firearm” within the meaning of the statute. Staples, 511 U.S. at 602, 114 S.Ct. 1793. The Act, in turn, makes it a crime to possess a firearm that is not registered. Id. at 602-03, 114 S.Ct. 1793. Staples possessed an unregistered semi-automatic rifle that, unbeknownst to him, had been modified to permit automat *641 ic firing. Id. at 603, 114 S.Ct. 1798. Upon prosecution under the Act, the district court ruled that the government did not have to prove that Staples knew the weapon fired automatically because of the modification by someone else. Id. at 604, 114 S.Ct. 1793. He was convicted and sentenced to prison. Id
On appeal, the Supreme Court reversed, saying “we must construe [an imprisonment] statute in light of the background rules of the common law in which the requirement of some mens rea for a crime is firmly embedded.” Id. at 605, 114 S.Ct. 1793 (citation omitted). While the government argued, as it does in this case, that a presumption of the need for a finding of mens rea did not apply in Staples, the Supreme Court rejected the argument and reversed, holding that Staples’s lack of knowledge of the weapon’s capability of automatic fire prohibited his conviction and prison sentence. Id. at 619, 114 S.Ct. 1793. And, the Supreme Court’s more recent and perhaps more forceful iteration of this state-of-mind requirement came in Torres v. Lynch, — U.S.-, 136 S.Ct. 1619, 194 L.Ed.2d 737 (2016). The Court, amplifying on Staples, stated:
Consider the law respecting mens rea. In general, courts interpret criminal statutes to require that a defendant possess a mens rea, or guilty mind, as to every element of an offense. That is so even when the “statute by its terms does not contain” any demand of that kind. In such cases, courts read the statute against a “background rule” that the defendant must know each fact making his conduct illegal. Or otherwise said, they infer, absent an express indication to the contrary, that Congress intended such a mental-state requirement.
Torres, 136 S.Ct. at 1630-31 (citations omitted) (first quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 70, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); next quoting Staples, 511 U.S. at 619, 114 S.Ct. 1793).
There is, of course, no express congressional statement to the contrary contained in § 331(a) or § 333(a)(1). While it might be possible to concoct an actionable interpretation of § 333(a)(1) that omits a mens rea requirement, Congress has no power to enact a federal statute that violates the Fifth Amendment Due Process Clause.
This court and the district court cite cases that they contend support a rationale that a criminal sentence of imprisonment is sometimes valid without proof of mens rea, or, a guilty mind. But, the cases advanced by the government and the courts cannot bear the load placed upon them, both as matters of fact and law. United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), a case substantially predating Zadvydas, Staples, and Torres, provided an opinion fashioned to remedy an unexpected jury verdict. Dot-terweieh, who was the president and general manager of a pharmacal company, was charged, along with his corporation, with three misdemeanor counts of violation of the Federal Food, Drug and Cosmetic Act under § 331(a) and § 331(a)(1). Dotterweich, 320 U.S. at 278, 64 S.Ct. 134. The jury found the corporation not guilty but convicted Dotterweich, fining him $500 on each of the three misdemeanor counts and imposing 60 days of probation. Id.; see United States v. Buffalo Pharmacal Co., 131 F.2d 500, 501 (2d Cir.1942), rev’d, Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48. There was no incarceration. The circuit court reversed the conviction and sentence but the Supreme Court reversed on the facts involved. Dotterweich, 320 U.S. at 285, 64 S.Ct. 134. Four justices dissented from Justice Frankfurter’s reversal opinion. Id. at 293, 64 S.Ct. 134.
*642 Both courts also advance the holding in United States v. Park, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). As an initial matter, it must be noted that Park was charged with 21 U.S.C. § 331(k), whereas the purported DeCoster violations involve § 331(a). Id. at 660, 95 S.Ct. 1903. And, Park was individually charged as President of Acme Markets, Inc., and tried and convicted by a jury on five counts of violating subsection (k). Id. at 660, 666, 95 S.Ct. 1903. He was, however, sentenced to $50 per count for a total of $250.00. Id. at 666, 95 S.Ct. 1903. There was no incarceration. Incarceration of Dotterweieh or Park, as we now know, would have violated Supreme Court precedent as clearly established in Zadvydas, Staples, and Torres.
In fashioning sentences or affirmances of such sentences today, the court and the district court opinions 'complain at length that Quality Egg between 2006 and 2010 failed to sufficiently test eggs for salmonella and perform other corporate activities in connection with its consumption-egg production and. marketing. But, the government’s individual criminal-activity allegations at issue here are bottomed upon acts occurring only in late July and early August of 2010.
The basis for the court’s affirmance of the district court is fully encapsulated as follows:
Here, as owner of Quality Egg, Jack decided which barns were, subject to salmonella environmental testing, and as chief operating officer, Peter coordinated many of the company’s salmonella prevention and rodent control efforts. Neither of the DeCosters claim to have been “powerless” to prevent Quality Egg from- violating the FDCA. Despite their familiarity with the conditions in the Iowa facilities, they failed to take sufficient measures to improve them. On this record, the district court reasonably found that “the defendants ‘knew or should have known,’ of the risks posed by the insanitary conditions at Quality Egg in- Iowa, ‘knew or should have known’ that additional testing needed to be performed before the suspected shell eggs were distributed to consumers, and ‘knew or should have known’ of [ ] proper remedial and preventative measures to reduce the presence of [salmonella].” The FDCA “punishes neglect where the law requires care.” We conclude that the record here shows that the DeCosters are liable for negligently failing to prevent the salmonella outbreak.
Ante at 632-33 (alterations in original) (citations omitted).
Thus, the court validates the district court’s prison sentence based upon the DeCosters’ supposed negligence in performing executive functions on behalf of Quality Egg. However, there is no precedent that supports imprisonment without establishing some measure of a guilty mind on the part of these two individuals, and none is established in this case. The government concedes in the DeCosters’ plea agreements that they did not know that any eggs distributed by Quality Egg at any relevant times “were, in fact, contaminated with Salmonella [Enteritidis].” Indeed, the plea agreements explicated above further concede that no person associated with Quality Egg had knowledge of salmonella contamination at any relevant time. And when first alerted to the problem by the FDA in August of 2010, Quality Egg immediately, and at great expense, voluntarily recalled “hundreds of millions of shell eggs produced at Quality Egg’s facilities.” This is hardly the stuff of “guilty minds.”
Finally, I concede that the court cites two cases in which individual prison sentences were imposed for violations of § 331(a) and § 333(a)(1). They are United *643 States v. Greenbaum, 138 F.2d 437 (3d Cir.1943), and United States v. Higgins, No. 09-403-4, 2011 WL 6088576 (E.D. Pa. Dec. 7, 2011). Neither case is apposite here for reasons of fact or law. Greenbaum is clearly wrong given Supreme Court precedent established since 1943, especially that found in Zadvydas, Staples, and Torres. And defendant Higgins, contrary to the DeCosters, “personally participated in the decisions to proceed with unauthorized clinical trials to test the safety and efficacy of [adulterated compounds] on humans.” Higgins, 2011 WL 6088576, at *13.
There is no proof that the DeCosters, as individuals, were infected with a “guilty mind” or, perhaps, even with negligence. Clearly] the improvident prison sentences imposed in this case were due process violations.
I respectfully dissent.

. I admit to advancing a measure of factual redundancy by way of this dissent. However, I do so to lay a foundation for some additional evidentiary emanations crucial to an adequate understanding of the management of this complex business operation insofar as such management relates to the criminal prosecution of these two corporate executives.

. Respectfully, I do not agree that Park, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489, casts a long, dark incarceration shadow over the DeCosters as contended by the court’s opinion and the separate concurrence, especially in view of the more recent Supreme Court jurisprudence emerging from Zadvydas, Staples, and Torres. The opinions should note that Park's sentence actually amounted to $250 in fines and no incarceration.
It is also unfair for the concurrence to contend that the DeCosters negligently failed to prevent a salmonella outbreak within the broad reach of their corporate operations. After all, the government fully conceded in the plea agreements used to obtain the convictions that neither the DeCosters nor any other Quality Egg employees were aware of any salmonella contamination at any times relevant to the misdemeanor violations charged in the criminal informations. It is likewise inequitable in my view for the court and the concurrence to credit the government’s inflammatory sentencing rhetoric received by the district court to support corporate-officer incarceration especially since such pleas were obtained through benign factual stipulations of criminal liability fully agreed upon by the parties.