**COLT INDUSTRIES, INC.**

v.

**The UNITED STATES.**

**No. 614–84T.**

United States Claims Court.

Oct. 23, 1986.

George D. Webster, Washington, D.C., for plaintiff, Frank M. Northam, and Webster, Chamberlain & Bean, of counsel.

Theodore D. Peyser, Washington, D.C., with whom was Acting Asst. Atty. Gen. Roger M. Olsen, Jr., for defendant.

## MEMORANDUM OF DECISION

HARKINS, Judge:

This tax refund case is before the court on cross-motions for partial summary judgment. Oral argument was heard on July 16, 1986. There is no dispute as to any material fact and disposition by summary judgment of Count I of the complaint is appropriate.

The Internal Revenue Service (IRS) disallowed, under section 162(f) of the Internal Revenue Code of 1954, as amended, deductions taken by plaintiff for payments that total $1.6 million to the Clean Air Fund and to the Clean Water Fund of the Commonwealth of Pennsylvania. The payments were made pursuant to a consent decree that directed payment of civil penalties assessed pursuant to section 309(d) of the Federal Water Pollution Prevention and Control Act (Clean Water Act), 33 U.S.C. § 1319(d) (1982) and section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b) (1982). The sole issue is whether the payments constitute "a fine or similar penalty paid to

a government for the violation of any law" for which a deduction as an ordinary or a trade or business expense is barred by I.R.C. § 162(f). For the reasons that follow, defendant's motion for partial summary judgment must be allowed.

Plaintiff, Colt Industries, Inc., in 1979, through its affiliated subsidiary, Crucible, Inc. (Crucible) manufactured basic steel and fabricated steel products at mills and plants in Midland, Pennsylvania. Crucible's operations were subject to regulation under several environmental protection laws and regulations, including the Federal Clean Air Act and the Federal Clean Water Act, the Pennsylvania State Implementation Plan (SIP) and the rules and regulations of the Pennsylvania Department of Environmental Resources (DER regulations), Title 25, Part I, Subpart C, Article III, Air Resources.

On May 31, 1972, the Administrator of the United States Environmental Protection Agency (EPA), pursuant to section 110 of the Clean Air Act, 42 U.S.C. § 7410, promulgated and approved major portions of the SIP for the attainment and maintenance of the national primary ambient air quality standards in Midland, Pennsylvania and other areas. The SIP included provisions of the DER that contained air pollutant emission limitations applicable to Crucible's Midland works.

On December 17, 1974, EPA Region III issued National Pollutant Discharge Elimination Permit No. PA0005754 to Crucible pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342. The permit authorized discharges of stated quantities of certain pollutants into the Ohio River.

In 1974, the EPA conducted inspections at Crucible's Midland works. In July and September 1976, EPA issued Notices of Violation to Crucible pursuant to section 113(a)(1) of the Clean Air Act, 42 U.S.C. § 7413(a)(1). In March 1977, more than 30 days after Crucible received the violation notices, EPA conducted another inspection and found that Crucible continued in violation of the requirements of the notices.

On August 7, 1977, certain Clean Air Act amendments became effective. Pub.L. No. 95–95, 91 Stat. 685 (1977). These amendments provide that violations of the SIP and DER regulations would render the violator liable to assessment of civil penalties of not more than $25,000 per day of violation. 42 U.S.C. § 7413(b). At this time, Crucible had not corrected the conditions in the violation notices.

On April 3, 1978, EPA advised Crucible that a compliance plan it had proposed regarding the 1976 violations was rejected because it did not provide for compliance with all applicable regulations by the statutory date. EPA indicated that it was willing to explore the possibility of arriving at an expeditious and mutually agreeable plan, and stated it was EPA policy to assess a civil penalty in any consent decree which at a minimum would be equal to the economic benefit which had accrued to the company since August 7, 1977.

On May 19, 1978, in connection with discussions with DER regarding compliance with Pennsylvania environmental controls, Crucible filed an application with the DER for a permit to construct an electric arc furnace shop. This application was approved by the DER on July 19, 1978.

On June 16, 1978, EPA requested the Justice Department to institute a civil action against Crucible seeking an injunction requiring Crucible to comply with emission regulations. EPA also recommended that civil penalties be sought in the amount of $25,000 per day of violation of the Clean Air Act. EPA further recommended that civil penalties be assessed for violations of permissible discharge levels allowed in the 1974 permit. Violations of the permit, under Clean Water Act § 301(a), made Crucible liable for civil penalties of up to $10,000 per day.

Negotiations with the DER resulted in a consent decree (DER decree), dated October 20, 1978, pursuant to which Crucible was to close the blast furnace and coke plant at Midland and purchase and install an electric arc furnace shop. The DER decree scheduled the construction of the

electric arc furnace facility and the shut down of the blast furnace to be done by December 31, 1982. The EPA did not participate in the negotiations with DER which produced the DER decree.

On December 7, 1978, EPA and Crucible met to discuss a proposed compliance plan and the settlement of the potential lawsuit EPA had recommended be brought against Crucible. Crucible, in January 1979, provided EPA with information to assist in the analysis of potential civil penalties under EPA's Civil Penalty Policy, dated April 11, 1978. Subsequently, EPA proposed several civil penalty amounts.

In February 1979, Crucible had offered $1.6 million cash, plus $400,000 of the amount representing economic benefits to be paid in escrow, with an appropriate percentage to be refunded in the event of compliance before March 1981. Crucible's offer was subject to final determination by EPA's penalty panel. On February 27, 1979, EPA completed a recalculation of its analysis of an appropriate civil penalty. The elements of the civil penalty figure, as recalculated, were summarized by EPA as follows (dollar amounts in millions):

|  | Was | Is |
|---|---|---|
| Economic Benefit | $5.0 | $4.86 |
| Environmental Harm | $ .577 | $ .577 |
| Recalcitrance | $ .250 | $ .150 |
| % Chance of Winning | 65% | 45% |
| Gross Penalty | $3.80 | $2.50 |
| Credits | $ .561 | $ .801 |
| Settlement Figure | $3.20 | $1.7 |

The penalty panel concluded that EPA could accept a $1.6 million civil penalty as consistent with the Penalty Policy Manual if there were compliance by July 1979 with certain water milestones.

Overall, negotiations for the EPA consent decree were conducted from December 1978 to April 1979. During negotiations, Government counsel informed Crucible that unless Crucible paid civil penalties of $1.6 million, the Government would initiate suit. Crucible requested that any payments made in conjunction with the consent decree should be made to the Borough of Midland Municipal Authority. This request was rejected; EPA agreed that such payments could be made to the Commonwealth of Pennsylvania Clean Air and/or Clean Water Funds in lieu of making them to the United States.

By letter dated February 23, 1979, Crucible requested EPA Region III's approval of the DER construction permit for the electric arc furnace shop. By letter of April 2, 1979, EPA refused to approve the DER construction permit because Crucible failed to meet EPA's requirement that there must be compliance with a federally enforceable compliance schedule or a consent decree. Crucible's application to the EPA for the permit approval coincided with the Crucible-EPA consent decree negotiations. The DER decree was insufficient under EPA's regulations because it was with a state agency and not federally enforceable. After the EPA–Crucible consent decree had been entered in court, EPA approved the construction plan/permit issued by DER.

On May 7, 1979, the EPA consent decree was filed with the United States District Court for the Western District of Pennsylvania. On May 21, 1979, notice of proposed consent decree was published in the Federal Register (Vol. 44, No. 99, P. 28548). On May 30, 1979, a complaint was filed against Crucible and Colt, to enjoin them from polluting the atmosphere from the Midland works in violation of the Clean Air Act, and from discharging pollutants into the Ohio River in violation of the Clean Water Act, and to impose civil penalties for violations of those Acts since 1974 to the present. On June 25, 1979, the consent decree was signed by the Court and judgment was entered.

On July 16 and July 24, 1979, Crucible remitted a check of $800,000 to the Pennsylvania Clean Air Fund and another $800,000 check to the Pennsylvania Clean Water Fund. Attached to each check was a stub that contained the phrase "E.P.A. Penalty."

On September 15, 1980, Colt timely filed a consolidated United States Corporation Income Tax Return for 1979 on behalf of Colt, Crucible, and Colt's other affiliated

subsidiaries. Colt claimed a deduction pursuant to I.R.C. § 162(a) for the $1.6 million which had been paid to the Clean Air and Clean Water Funds. The IRS disallowed the deduction on the basis that the payments constituted "fines or similar penalties under I.R.C. § 162(f) and, therefore, were not deductible." As a result of this disallowance, Colt's tax liability was increased by $736,000. Interest assessed on this amount was $175,942. Colt has paid both amounts. Plaintiff now seeks in Count I, after other adjustments, to recover the interest it paid due to the disallowance of the $1.6 million deduction.

## DISPOSITION

I.R.C. § 162(a) provides a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Crucible's payments made to the Commonwealth of Pennsylvania Clean Air and Clean Water Funds would be allowable as deductions under I.R.C. § 162(a) if their deduction is not barred by I.R.C. § 162(f).

I.R.C. § 162(f) was added by section 902(a) of the Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487 (1969). It provides:

> (f) Fines and Penalties—No deduction shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law.

Although the $1.6 million in payments was denominated as "civil penalties" in the EPA consent decree, plaintiff contends that the payments were not a "fine or similar penalty" under I.R.C. § 162(f). Plaintiff argues: (1) the payments represented a remedial or compensatory payment in restitution of the economic benefit gained from Crucible's alleged noncompliance with environmental laws and regulations; and (2) the payments were agreed to and made in order to obtain the permit from DER, which allowed Crucible to construct the electric arc furnace facility, and permission, under the EPA consent decree, to continue Crucible's operations at the Midland plant until the electric arc furnace

facility could be installed and compliance with pollution control laws achieved.

Section 162(f) was added to I.R.C. § 162 in the Tax Reform Act of 1969. It specifically was made retroactive. The legislative history states that I.R.C. § 162(f) was intended to codify existing court decisions. S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad. News 1645, 2310; Conf.Rep. No. 782, 91st Cong., 1st Sess., *reprinted in* 1969 U.S.Code Cong. & Ad.News 2447.

At the time I.R.C. § 162(f) was enacted, a general rule had evolved in administration of the income tax that deductions which frustrate sharply defined national or state policies that prescribe particular types of conduct would be disallowed. The rationale behind the rule was that the allowance of deductions for fines and similar penalties would take the sting out of penalties prescribed by law. *Tank Truck Rentals, Inc. v. Commissioner*, 356 U.S. 30, 35–36, 78 S.Ct. 507, 510–11, 2 L.Ed.2d 562 (1958); *Commissioner v. Heininger*, 320 U.S. 467, 473, 64 S.Ct. 249, 253, 88 L.Ed. 171 (1943).

The Senate Finance Committee, which in 1969 had proposed I.R.C. § 162(f) by amendment to the House bill, attempted in 1971 to clarify the definition of "fines and similar penalties." The Committee explained:

> In approving the provisions dealing with fines and similar penalties in 1969, it was the intention of the committee to disallow deductions for payments of sanctions which are imposed under Civil Statutes but which in general terms serve the same purpose as a fine exacted under a criminal statute. * * * On the other hand, it was not intended that deductions be denied in the case of sanctions imposed to encourage prompt compliance with requirements of law. Thus, many jurisdictions impose "penalties" to encourage prompt compliance with filing or other requirements which are really more in the nature of late filing charges or interest charges than they are of fines.

S.Rep. No. 437, 92d Cong., 1st. Sess., *reprinted in* 1971 U.S.Code Cong. & Ad. News 1825, 1980. Legislative history contained in committee reports in a subsequent Congress generally is accorded little weight. The Court of Claims, however, found this report to be of some value because the Senate Finance Committee recommended I.R.C. § 162(f) be reenacted without change. *Adolf Meller Co. v. United States*, 600 F.2d 1360, 1363, 220 Ct.Cl. 500 (1979).

Treasury Regulations on Income Tax (1954 Code), § 1.162–21(b)(1)(iii) provides that "a fine or similar penalty includes an amount * * * [p]aid in settlement of the taxpayer's actual or potential liability for a fine or penalty (civil or criminal)." In the *Meller* case, the Court of Claims held the regulation to be a valid interpretation of section 162(f). The court affirmed that existing case law prohibited deduction of civil penalties, and payments made in compromise settlements. A contention that section 162(f) applied only to fines following criminal convictions was rejected.

■ The Tax Court, in consideration of the content of the phrase "similar penalties" has used the Senate Finance Committee report as the touchstone for analysis of the scope of I.R.C. § 162(f). In *Southern Pac. Transp. Co. v. Commissioner*, 75 T.C. 497 (1980), the Tax Court cited the Senate Finance Report and stated that by the use of the word "similar", Congress intended to distinguish between different types of civil penalties. If a civil penalty is imposed to enforce the law and to punish violations of the law, the penalty is "similar" to a fine and therefore not deductible. If, however, the civil penalty is imposed to encourage prompt compliance with a requirement of the law, or as a remedial measure to compensate another party for expenses incurred as a result of the violation, it is not "similar" to a fine under I.R.C. § 162(f) and therefore deductible. *See also Huff v. Commissioner*, 80 T.C. 804, 823 (1983). The Tax Court, accordingly, has inquired into the purpose of the civil penalty to determine the applicability of I.R.C.

§ 162(f). *S & B Restaurant, Inc. v. Commissioner*, 73 T.C. 1226, 1232 (1980) (determined purpose payments were designed to serve); *Middle Atlantic Distributors, Inc. v. Commissioner*, 72 T.C. 1136, 1144 (1979) (inquiry into purpose of claim of violation); *Uhlenbrock v. Commissioner*, 67 T.C. 818, 823 (1977) (origin of payment determines character).

■ The civil penalties paid by plaintiff were assessed pursuant to section 113(b) of the Clean Air Act and section 309(d) of the Clean Water Act. The legislative history of section 113(b) of the Clean Air Act, as added by section 4(a), Clean Air Amendments of 1977, Pub.L. No. 91–604, 84 Stat. 1676 (1977), explains that section 113(b) was added "[t]o provide a more flexible and effective enforcement tool, to better fit the punishment or remedy to the nature of the violation." H.R.Rep. No. 294, 95th Cong., 1st Sess. 69, 1977 U.S.Code Cong. & Ad. News 1077, 1147. Significantly, the report cites the Food, Drug, and Cosmetic Act (FDCA) on which the Clean Air Act is patterned in many respects, as a reason a knowledge requirement for the civil penalties provision was rejected. The report indicated that the Committee intended the civil penalty provisions of the Act to assure that the rationale of *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) would apply to enforcement of the Clean Air Act. In *Park*, the Court stated that the FDCA "punishes neglect where the law requires care, or inaction where it imposes a duty." *Id.* at 671, 95 S.Ct. at 1911. The facts regarding the punitive nature of the civil penalty provisions outweigh the references in the report to a "remedial" or "deterrent" purpose.

The legislative history of the Clean Water Act does not provide significant insight into the question regarding the punitive nature of section 309(d) of the Act, 33 U.S.C. § 1319(d). The history only states that in drafting the Clean Water Act civil penalty provision, the "Committee drew extensively upon the provisions of the Clean Air Act of 1970." S.Rep. No. 414, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.

Code Cong. & Ad.News 3668, 3730. The legislative history mentions the overall objective of compliance with federal pollution legislation, and the context of the statement suggests the civil penalty provision has a punitive objective. The Committee states that the "threat of sanction must be real, and enforcement provisions must be swift and direct." In light of this enforcement scheme, the argument that the civil penalties should be deductible hardly seems plausible.

Plaintiff points to Treasury Regulation § 1.162–21(b)(2) which provides that "[c]ompensatory damages (including damages under section 4A of the Clayton Act (15 U.S.C. § 15a as amended)) paid to a government do not constitute a fine or penalty." Colt asserts that its payments to the Pennsylvania Funds similarly are compensatory or remedial in nature, not punitive. Clayton Act § 4A, 15 U.S.C. § 15a, authorizes the United States to recover damages under the antitrust laws for injuries to its business or property. The recovery is compensation for injuries suffered by the United States as a consumer of goods and services, it is not compensation for injuries to the general welfare or for exercise of sovereign functions. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 265, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972). Pollution controls in this case are imposed for the general welfare by the exercise of sovereign powers. Civil penalties are to protect those interests, not to compensate for injuries to proprietary interests in business or property.

Plaintiff argues that the factual background which gave rise to the payment of the civil penalties demonstrates that the payments were compensatory or remedial and that the lengthy negotiations with EPA indicate that the civil penalties were not meant to punish. Plaintiff also places reliance on the EPA Penalty Policy Manual which sets forth four elements in the penalty calculation and which was used to calculate plaintiff's penalty amount: (i) to redress harm or risk to public health/environment; (ii) to remove economic benefit gained by noncompliance; (iii) for violator's

recalcitrance, defiance, or indifference to requirements of law; and (iv) to recover unusual enforcement costs thrust upon the public. Ninety-seven percent of plaintiff's civil penalty was attributable to the economic benefit plaintiff gained from noncompliance; 3 percent was attributable to recalcitrance. Plaintiff concedes that the 3 percent attributable to recalcitrance is punitive in nature. Plaintiff argues that it is either de minimus or can be accounted for by allocation, and in any event it does not taint the entire civil penalty. Plaintiff argues that the economic benefit factor in essence is restitution for damage to Pennsylvania's air and water. Plaintiff does not explain how removal of its economic benefit is a restitution for injury caused by pollution. Nor does plaintiff explain why its removal in fact is not exacted to punish Colt for noncompliance.

Plaintiff misconstrues the importance of the factors in the EPA Penalty Policy Manual as evidence that the civil penalties were compensatory or remedial. Plaintiff fails to take account of the purpose of the penalty provisions of the Clean Air Act and the Clean Water Act. The formula which was used to calculate the amount of the civil penalties is not determinative of the purpose of the statutory penalty or the origin of the liability. EPA has no authority to seek compensation to redress damage to the environment that violates the Acts.

Plaintiff cites a number of cases which recognize civil penalties as compensatory or remedial and beyond the scope of section 162(f). *Middle Atlantic Distributors, Inc. v. Commissioner*, 72 T.C. 1136, involved a statute with both punitive and remedial aspects. The parties in *Middle Atlantic* agreed to a settlement amount which was labelled "Liquidated Damages" and was substantially less than demanded in the Government's complaint. The Tax Court held that the payment was remedial and deductible because the Government intended only to recover reimbursement for lost revenues; such intent does not comport with an intent to punish. The payment

was equal to customs duties lost by the Government.

In *True v. United States,* 603 F.Supp. 1370 (D.Wyo.1985), the court held that a penalty for an oil spill imposed under section 311(b)(6) of the Clean Water Act is a deductible business expense under I.R.C. § 162(a). The court interpreted the statute as a shifting-of-the-risk and concluded that the purpose behind 33 U.S.C. § 1321(b)(6) in the Clean Water Act is remedial and compensatory. The civil penalties in plaintiff's case were not imposed pursuant to the same section of the statute and they were not "imposed regardless of fault" as were those in *True. Id.* at 1374. The penalties at issue here were imposed for Crucible's failure to make the expenditures necessary to bring itself into initial compliance with the applicable antipollution standards.

Plaintiff also argues that *Mason and Dixon Lines, Inc. v. United States,* 708 F.2d 1043 (6th Cir.1983) indicates that the civil penalties involved here are deductible. In *Mason and Dixon,* the taxpayer was convicted of weight violations in Virginia and was required to make payments to the state. The court held that the payments were determined by the amount of excess weight and were compensatory. Language in the statute indicated that the liquidated damages were not a penalty. The payments made by Colt in this case do not purport to return the parties to the *status quo ante.*

Plaintiff argues that *S & B Restaurant, Inc. v. Commissioner,* 73 T.C. 1226 (1980) virtually is identical to the case at hand. The Tax Court found that monthly payments under a consent decree made to the Pennsylvania Clean Water Fund were not a fine or penalty under I.R.C. § 162(f), but, in effect, were permit fees. The court found that the payments made by S & B were made "in consideration of being allowed to continue to discharge its sewage waste" and allowed the deduction. *Id.* at 1232. The court considered four factors: (1) taxpayer was obligated to connect to the sewer system, and the payments continued only to the time of connection, (2) the pay-

ments equalled the charges payable if the sewer system had been available, (3) taxpayer was not permitted to construct its own sewage treatment facilities, and (4) continued discharge of sewage waste would not result in practical environmental harm. None of these factors are present in the instant case. The EPA consent decree did not permit Crucible to continue its polluting actions unabated. Numerous interim and permanent measures by Crucible were required in order to achieve compliance.

Plaintiff's contention that the civil penalties were compensatory in nature must be rejected. The EPA Civil Penalty Policy Manual provides that penalties are not effluent or discharge fees and that payment of penalties does not confer a right or privilege to continue operation in violation of law or to slow down compliance. There is no allegation that the business or property of the United States Government was damaged by the alleged violations of the Clean Water and Clean Air Acts. Nor is there any allegation that there was such damage to the business or property of the State of Pennsylvania. There was no claim for damages to restore such business or property to its previous condition, as would be involved in a claim for compensatory damages. The complaint on which the consent decree was based sought injunctive relief and civil penalties for past violations.

Plaintiff argues that the civil penalties in question were remedial in nature. Every civil penalty has a remedial aspect, in the sense that it is to deter violations and encourage compliance with the law. If a remedial purpose were enough to take a civil penalty payment out of the ambit of section 162(f), then virtually no civil penalty would be subject to section 162(f), contrary to Treasury Regulation §§ 1.162–21(b)(ii) and (iii) and *Adolf Meller Co. v. United States,* 600 F.2d 1360, 220 Ct.Cl. 500.

Plaintiff overlooks the fact that "remedial" is not used in section 162(f) or in the definition of "fine or similar penalty" in Treasury Regulation § 1.162–21(b). "Re-

medial" has a meaning which is different from "compensatory damages." Compensatory damages can be remedial in the sense that they discourage wrongful conduct, but remedial payments are not compensatory when they are based on factors other than the resulting damage or diminution in value and serve some purpose other than making the victim whole. Clearly, the civil penalties in the instant case were imposed for violations of the law and in no sense constituted "a remedial measure to compensate another party for expenses incurred as a result of the violation." *Southern Pac. Transp. Co. v. Commissioner*, 75 T.C. at 652. Plaintiff fails to establish that the applicable provisions of either the Clean Water Act or the Clean Air Act are remedial in nature or that the penalties were imposed to encourage prompt compliance of the law.

██ Plaintiff's second argument in support of its motion for partial summary judgment is that the payments at issue were made as a necessary condition to the entry of a consent decree that would permit Crucible to proceed with the construction of the electric arc furnace and to continue operating the Midland facilities until the new furnace was completed. In order to comply with the schedule in the previously negotiated DER consent decree, EPA's approval of the construction permit was necessary. EPA refused to grant its approval for issuance of the permit until Crucible accepted the EPA consent decree. Plaintiff asserts that it believed there were meritorious defenses to the impending EPA lawsuit, and that there was never an adequate explanation of the monetary settlement figure made by the Justice Department attorneys. Based on these assertions, Colt says that, essentially, the payments of the civil penalties were in the nature of fees for construction and operating permits.

The EPA consent decree had a dual purpose. Much of the negotiations were devoted to the establishment of a compliance schedule for Crucible. The decree also served to enforce the EPA's assessment of penalties. A consent decree is an alternative to adversary judicial action. Crucible had a choice of settlement via the consent decree or litigation and it chose to settle its potential liabilities. Plaintiff argues that it was forced to enter the EPA consent decree which included the civil penalties in order to obtain approval for construction of the electric arc furnaces. Defendant's counter argument is persuasive. Each party to a settlement has needs that are met by avoiding litigation; these needs or motives, however, are not relevant to a determination of the character of the agreement.

The EPA consent decree required Crucible, in addition to payment of the civil penalties, to take a number of steps to reduce pollution from the Midland Plant. These included specific measures at outfalls 001 and 004 regarding water pollution. As to air pollution, Crucible was required to implement an interim emission control program at the coke plant, shut down blast furnace No. 3, refrain from flaring coke oven gas, and make changes in its top blown oxygen conversion process.

The civil penalties were based on the EPA Civil Penalty Policy Manual, dated April 11, 1978. The manual was made available to Crucible on February 5, 1979, together with a process-by-process analysis of EPA's penalty calculations. EPA's recalculation of the Policy Manual elements that apply to the civil penalties reflect an unseemly desire to settle and demonstrate enforcement action. EPA's insistence upon a consent decree with civil penalties before it would approve the DER construction permit, however, does not amount to overreaching. Such procedure is well within the ambit of legitimate enforcement discretion. Plaintiff has no foundation for its argument that the money it paid was a fee to continue polluting the air and water at the Midland Plant until the necessary modifications were completed.

For the foregoing reasons, plaintiff's motion for summary judgment on Count I of the first amended complaint is DENIED; defendant's cross-motion for partial summary judgment is ALLOWED. A separate

order will govern further proceedings as to Count II of the complaint.