**UNITED STATES of America, Plaintiff,**

v.

**LAERDAL MANUFACTURING CORPORATION, a corporation, and John L. Karpowicz, an individual, Defendants.**

**Civ. No. 93-1141-FR.**

United States District Court, D. Oregon.

May 26, 1994.

Frank W. Hunger, Asst. Atty. Gen., Kristine Olson Rogers, U.S. Atty., Craig J. Casey, Asst. U.S. Atty., Portland, OR, Elizabeth Stein, Gerald C. Kell, U.S. Dept. of Justice, Washington, DC, for plaintiff.

James F. Dulcich, Jeffrey D. Austin, Miller, Nash, Wiener, Hager & Carlsen, Portland, OR, Larry R. Pilot, Daniel E. Johnson, Daniel G. Jarcho, Mark D. Shonkwiler, McKenna & Cuneo, Washington, DC, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRYE, District Judge:

The matters before the court are (1) the motion of the plaintiff for preliminary injunction (# 45) filed December 1, 1993; (2) the motion of the defendants for partial summary judgment (# 64) filed January 13, 1994; and (3) the resolution of this case on the merits.

The plaintiff, the United States of America, filed this action against the defendants, Laerdal Manufacturing Corporation (Laerdal Manufacturing) and John L. Karpowicz, the president of Laerdal Manufacturing, pursuant to section 302(a) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 332(a). The United States contends that Laerdal Manufacturing and Karpowicz have violated the Act and the regulations implementing the Act. The Act and the regulations implementing the Act are administered by the Food and Drug Administration (the FDA), acting on behalf of the United States. The United States seeks to enjoin prelimi-narily and permanently Laerdal Manufacturing and Karpowicz from violating section 301 of the Act, 21 U.S.C. § 331.

Laerdal Manufacturing and Karpowicz deny that they have violated any of the statutory and regulatory mandates and, in turn, have alleged three counterclaims as follows: (1) the United States breached the settlement agreement reached on October 20, 1993; (2) the regulations at issue are unconstitutionally vague as applied to the facts of this case; and (3) the United States has violated the Administrative Procedure Act by attempting to enforce procedural requirements that have never been promulgated for notice and comment, and thus are not requirements under the Act.

This court has jurisdiction over the claims of the United States and the counterclaims of Laerdal Manufacturing pursuant to 28 U.S.C. §§ 1331, 1337 and 1345; 21 U.S.C. § 332(a); 5 U.S.C. §§ 702 *et seq.;* and 28 U.S.C. § 2201.

On February 15, 1994, trial to the court commenced on the motion of the United States for a preliminary injunction, as well as the resolution of the case on the merits. The trial concluded on March 4, 1994. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Laerdal Manufacturing is incorporated in the State of New York and conducts its business at 9440 Southwest Tualatin–Sherwood Road, Tualatin, Oregon.

John Karpowicz is the president of Laerdal Manufacturing and performs his duties at 9440 Southwest Tualatin–Sherwood Road, Tualatin, Oregon. Karpowicz is responsible for the operations of Laerdal Manufacturing.

Laerdal Manufacturing has been and is now engaged in the business of manufacturing and distributing automatic and semiautomatic external defibrillators and of distributing accessories for these medical devices. Laerdal Manufacturing manufactures two lines of automated external defibrillators: the Heartstart 1000 line, which includes the HS1000 and the HS1000s; and the Hearts-

tart 3000 line, which includes the HS3000, the HS3000ATS, and the HS3000QR.

These automated external defibrillators are used in the assessment and treatment of ventricular fibrillation and ventricular tachycardia. Automated external defibrillators are medical devices subject to governmental regulations administered by the FDA. Laerdal Manufacturing is required to comply with the Act and with the regulations implementing the Act, which include the Good Manufacturing Practices (GMP) regulations, 21 C.F.R. §§ 820.1–820.198 (1993), and the Medical Device Reporting (MDR) regulations, 21 C.F.R. §§ 803.1–803.36 (1993).

From January 19, 1993 through February 25, 1993, investigators from the Seattle District Office of the FDA conducted a regulatory inspection of the Laerdal Manufacturing plant in Tualatin, Oregon. At the end of the inspection, the FDA investigators issued a Notice of Inspectional Observations on a form known as "FDA Form 483" and thereafter met with representatives of Laerdal Manufacturing.

On March 28, 1993, Kenneth Herland was hired by Laerdal Manufacturing as the Director of Quality Assurance and Regulatory Affairs. Herland's first task was to review the quality assurance system used by Laerdal Manufacturing. As a result of this review, Laerdal Manufacturing made changes in its quality assurance system, addressing certain observations noted in FDA Form 483 issued following the regulatory inspection conducted from January 19, 1993 through February 25, 1993.

On April 2, 1993, representatives from Laerdal Manufacturing and officials from the Seattle District Office of the FDA met to discuss the inspectional observations noted on FDA Form 483 following the regulatory inspection conducted from January 19, 1993 through February 25, 1993 and the preliminary written responses that Laerdal Manufacturing had made to FDA Form 483. After this meeting, Laerdal Manufacturing submitted a more detailed written response to the observations noted on FDA Form 483.

From May 24, 1993 to June 4, 1993, FDA investigators conducted a limited inspection of the Laerdal Manufacturing plant. At the conclusion of this inspection, the FDA investigators issued another FDA Form 483 and again met with representatives of Laerdal Manufacturing.

On June 25, 1993, Laerdal Manufacturing sent to the FDA a written response to the issues raised in the inspection conducted by FDA investigators from May 24, 1993 to June 4, 1993.

On July 30, 1993, legal counsel for the United States contacted legal counsel for Laerdal Manufacturing to advise Laerdal Manufacturing of the intent of the United States to seek injunctive relief against Laerdal Manufacturing.

During the months of August and September, 1993, there were discussions between representatives of the FDA and representatives of Laerdal Manufacturing. During this time, Laerdal Manufacturing submitted to the FDA a "GMP review plan" indicating the tasks that Laerdal Manufacturing had undertaken and would undertake in the future to address the issues raised in FDA Form 483. The GMP review plan addressed the scope of the review and the extent of the revision of procedures, as well as the time frames within which Laerdal Manufacturing planned to complete these tasks.

On September 15, 1993, the United States filed a complaint in this court against Laerdal Manufacturing and Karpowicz seeking preliminary and permanent injunctive relief for Laerdal Manufacturing's alleged violations of the regulations relating to good manufacturing practices and medical device reporting.

On October 12, 1993, Laerdal Manufacturing and Karpowicz filed an answer to the complaint filed on September 15, 1993 in which they deny all of the allegations made by the United States of violations of the Act and its regulations.

On October 18, 1993, this court held a hearing on the motion for a preliminary injunction filed by the United States.

On October 19, 1993, at the request of the court, representatives of the parties and counsel for the parties attended a settlement conference before the Honorable Owen M.

Panner, United States District Court Judge, who had agreed to act as a settlement judge. During the settlement conference, Judge Panner directed the parties to meet again that day to attempt to reach a settlement and to report back to him the next day to advise him whether a settlement had been reached. The parties and their counsel met that day.

On October 20, 1993, counsel for the United States, counsel for Laerdal Manufacturing and Karpowicz, and Thomas J. Burns, the chairman of the Board of Laerdal Manufacturing, reported back to Judge Panner.

Following the conference with Judge Panner, the parties signed a stipulation agreeing, in part, as follows:

1. Plaintiff (the "FDA") will begin an inspection of Laerdal Manufacturing Corporation's Tualatin, Oregon, facility on or after October 25, 1993.

2. Defendants will cooperate fully with the inspection and make all of its non-privileged and non-work product documents available to the FDA upon request.

3. The FDA will submit by November 17, 1993, to defendants and to Judge Owen M. Panner a report of the results of the FDA's inspection.

4. Defendants will submit by November 24, 1993, to the FDA and to Judge Panner a response to the FDA's report.

5. Judge Panner has scheduled a further settlement conference for December 2, 1993, at 8:00 a.m. The parties will present personnel and/or expert witnesses at that conference to assist Judge Panner, as necessary.

6. Judge Helen J. Frye has scheduled a trial on the merits in this action to begin December 14, 1993, at 9:00 a.m. The focus of the trial shall be any issues from the above inspection which the parties have not resolved.

Exhibit 1 to Defendants' Motion for Partial Summary Judgment, Tab B.

Pursuant to the agreement of the parties, from October 25, 1993 through November 12, 1993, the FDA conducted an inspection of Laerdal Manufacturing's facility in Tualatin, Oregon.

Pursuant to the agreement of the parties, on November 17, 1993, the FDA provided to Laerdal Manufacturing and Karpowicz in FDA Form 483 a report of the results of the FDA's inspection.

Pursuant to the agreement of the parties, on November 24, 1993, Laerdal Manufacturing and Karpowicz provided a response to the report of the results of the FDA's inspection that had been provided in FDA Form 483.

On December 1, 1993, the United States filed an amended complaint for an injunction, asking this court to order, in part:

I. That defendants, Laerdal Manufacturing Corporation, a corporation, and John L. Karpowicz, an individual, and each and all of their officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them, or any of them, be perpetually restrained and enjoined from directly or indirectly doing or causing to be done any of the following acts:

A. Introducing or delivering for introduction into interstate commerce any device which is adulterated within the meaning of 21 U.S.C. § 351(h); or

B. Manufacturing, processing, packing, or labeling, or holding for sale any device after shipment of one or more of its components in interstate commerce, which act of manufacturing, processing, packing, labeling or holding for sale causes such device to be adulterated within the meaning of 21 U.S.C. § 351(h).

C. Introducing or delivering for introduction into interstate commerce any device which is misbranded within the meaning of 21 U.S.C. §§ 352(j) or 352(t)(2).

D. Manufacturing, processing, packing, or labeling, or holding for sale any device, after shipment of one or more of its components in interstate commerce, which act of manufacturing, processing, packing, labeling or holding for sale causes such device to be misbranded within the meaning of 21 U.S.C. §§ 352(j) or 352(t)(2).

E. Failing or refusing to furnish information required by or under 21 U.S.C.

§ 360i, in accordance with the MDR regulation, Part 803.

Amended Complaint for Injunction, pp. 7–8.

On January 11, 1994, Laerdal Manufacturing and Karpowicz filed their answer to the amended complaint, along with three counterclaims.

On January 13, 1994, Laerdal Manufacturing and Karpowicz moved for an order of partial summary judgment in their favor as a matter of law on their counterclaim for breach of an oral settlement agreement allegedly entered into by the parties on October 20, 1993, and on certain claims made by the United States in the amended complaint on the grounds that the acts allegedly taken by Laerdal Manufacturing and Karpowicz are not prohibited by the identified GMP regulations.

From February 15, 1994 through March 4, 1994, the case was tried to this court. The testimony of expert witnesses and of fact witnesses was presented by both of the parties. Numerous exhibits were admitted into evidence.

Following the trial, the parties submitted written arguments and proposed Findings of Fact and Conclusions of Law.

## CONTENTIONS OF THE UNITED STATES

The United States contends that the evidence presented at trial demonstrates that Laerdal Manufacturing is not in compliance with the following GMP regulations:

(1) 21 C.F.R. § 820.20(a)(3), which relates to the responsibility of a manufacturer to identify, recommend or provide solutions for quality assurance problems and to verify the implementation of the solutions;

(2) 21 C.F.R. § 820.20(a)(4), which relates to the responsibility of a manufacturer to assure that all quality assurance checks are appropriate and adequate for their purpose and are performed correctly;

(3) 21 C.F.R. § 820.100(a), which relates to the responsibility of a manufacturer to establish written procedures for specification control;

(4) 21 C.F.R. § 820.116(a), which relates to the responsibility of a manufacturer to establish written procedures for reprocessing;

(5) 21 C.F.R. § 820.116(b), which relates to the responsibility of a manufacturer to establish written procedures for reprocessing controls;

(6) 21 C.F.R. § 820.161, which relates to the responsibility of a manufacturer to investigate a critical device or component which does not meet its performance specifications;

(7) 21 C.F.R. § 820.162, which relates to the responsibility of a manufacturer to investigate any failure of a critical device or component to meet performance specifications after release for distribution; and

(8) 21 C.F.R. § 820.198, which relates to the responsibility of a manufacturer to investigate any written or oral complaints relative to the identity, quality, durability, reliability, safety, effectiveness or performance of a device.

In addition, the United States contends that the evidence presented at trial demonstrates that Laerdal Manufacturing did not file the reports required under the MDR regulations, 21 C.F.R. Part 803, including the reports required for a documented death.

Finally, the United States contends that two documented hazardous events involving the HS1000 device and the HS1000s device manufactured by Laerdal Manufacturing establish that these defibrillators are dangerous to the health of a patient when they are used in a manner recommended or suggested in their labeling.

The United States argues that Laerdal Manufacturing's history of past violations of the Act combined with its present violations supports an inference that future violations are likely to occur, and that this court should order Laerdal Manufacturing to cease the manufacture and the distribution of its defibrillators until such time as the FDA has determined that the operations of Laerdal Manufacturing comply with all of the requirements of the GMP and the MDR. The United States argues that this relief is necessary in order to ensure that the expectation of the public for safe and effective devices is being met.

## CONTENTIONS OF LAERDAL MANUFACTURING AND KARPOWICZ

Laerdal Manufacturing and Karpowicz contend that the United States has presented no credible evidence that Laerdal Manufacturing has violated the GMP regulations. Laerdal Manufacturing and Karpowicz contend, to the contrary, that they have presented credible, convincing evidence at the trial that they have quality assurance procedures and practices that comply with 21 C.F.R. §§ 820.20(a)(3), 820.20(a)(4), 820.100(a), 820.116(a), 820.116(b), 820.161, 820.162 and 820.198.

Laerdal Manufacturing and Karpowicz contend that the United States presented no evidence at trial to prove its allegation that Laerdal Manufacturing violated any of the MDR regulations.

In addition, Laerdal Manufacturing and Karpowicz contend that there is no evidence in the record which supports the position of the United States that the HS1000 device or the HS1000s device is misbranded under 21 U.S.C. § 352(j).

Laerdal Manufacturing and Karpowicz contend that even if the court concludes that the United States has met its burden of proof regarding past violations of the regulations, there is no evidence in the record to support a finding that there is any cognizable danger that such violations will occur in the future. Laerdal Manufacturing and Karpowicz contend that the evidence shows that Laerdal Manufacturing has remedied the concerns of the FDA, has retained consultants to address the alleged problems, and has made comprehensive revisions to its GMP and MDR procedures that will assure continued compliance with the regulations.

Laerdal Manufacturing and Karpowicz explain that the only evidence presented by the United States in response to the changes made by Laerdal Manufacturing was the testimony of an FDA representative which was unconvincing, and, for the most part, irrelevant.

Laerdal Manufacturing and Karpowicz further contend that the United States has not presented any evidence to prove its claim that this court should order Laerdal Manufacturing not to distribute any automated external defibrillators in order to correct the alleged deficiencies in the compliance of Laerdal Manufacturing with the GMP regulations and the MDR regulations.

## STANDARD OF REVIEW

The proceedings before the court combine the motion of the United States for preliminary injunctive relief with the prayer of the United States for permanent injunctive relief on the merits. The United States seeks an order of the court mandating that Laerdal Manufacturing cease the manufacture and the distribution of its defibrillators until such time as the FDA has determined that the manufacturing and the distribution operations at the site in Tualatin, Oregon comply with all of the GMP and MDR regulations.

Injunctive relief to enforce the provisions of the Act is expressly authorized by 21 U.S.C. § 332(a), which provides, in relevant part, that "[t]he district courts of the United States ... shall have jurisdiction, for cause shown ... to restrain violations of section 331 of this title."

The factors that courts traditionally consider in determining whether to grant a preliminary injunction are (1) the likelihood of the plaintiff's success on the merits; (2) the possibility of the plaintiff suffering irreparable injury if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by the provision of preliminary relief. *Dollar Rent A Car, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1374 (9th Cir. 1985). To obtain a preliminary injunction, the moving party must show either (1) a combination of success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised, and the balance of hardships tips in its favor. *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 314–15 (9th Cir.1978), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). These two formulations represent two points on a sliding scale in which the required degree of

irreparable harm increases as the probability of success decreases. *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985).

■ Where, as in this case, an injunction is authorized by statute, and the United States proves that the defendants are in violation of the statute, the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury in order to obtain a preliminary injunction. *Navel Orange Admin. Comm. v. Exeter Orange Co.,* 722 F.2d 449, 453 (9th Cir.1983). Where the statutory conditions are satisfied, no specific showing of the precise way in which the violation of law will result in public harm is required, and the court will presume that the government would suffer irreparable harm from the continuing violation of the statute. *United States v. Odessa Union Warehouse Co-op.,* 833 F.2d 172, 175 (9th Cir.1987).

In *Odessa Union,* the court explained:

The function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants. This is not to say that the violation of a federal statute automatically requires a district court to issue an injunction. The essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case. However, the fact that a federal statute is being enforced by the agency charged with that duty may alter the burden of proof of a particular element necessary to obtain injunctive relief. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the courts to enforce them when asked.

*Id.* at 174–75 (citations omitted).

However, even where a statutory violation has been proven, the United States Supreme Court has explained that:

[a]lthough particular regard should be given to the public interest, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to

do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." ...

"Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles.... 'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'"

*Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987) (citations omitted).

The FDA is required by the Act to regulate the manufacturing practices of those industries which manufacture medical devices in order to ensure that the medical devices are safe and effective for their intended use. The financial hardship of a manufacturer who voluntarily enters a regulated industry cannot outweigh the interests of the public in protection from products or procedures which violate the law. In *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), a case involving the criminal prosecution of a company and its president under the Act, the United States Supreme Court stated:

The requirements of foresight and vigilance imposed on responsible corporate agents are beyond question demanding, and perhaps onerous, but they are no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them.

*Id.* at 672, 95 S.Ct. at 1911.

Congress has directed the FDA to promulgate manufacturing regulations which are intended to provide assurance to the public that the medical devices which Laerdal Manufacturing manufactures and distributes are safe and are effective for their intended use. Pursuant to the will of Congress, this court has jurisdiction, for good cause shown, to restrain Laerdal Manufacturing from violat-

ing the regulations promulgated by the FDA by entering an injunction designed to restrain further violations of the Act if the court finds by a preponderance of the evidence that Laerdal Manufacturing has violated the regulations and that there is reason to believe that Laerdal Manufacturing and Karpowicz will continue to do so absent such an order by this court.

## ANALYSIS

*Alleged Violations of the GMP Regulations*

The automated external defibrillators manufactured by Laerdal Manufacturing must be manufactured, processed and held in accordance with current good manufacturing practices to assure the safety and effectiveness of the device. 21 U.S.C. § 360j(f). A medical device which has been manufactured, processed, packed or held in violation of this requirement is deemed adulterated. 21 U.S.C. § 351(h).

Current good manufacturing practices are defined by industry standards and by regulations adopted by the FDA and published at 21 C.F.R. Part 820. Section 820.1 defines the scope of these regulations. It states, in relevant part:

> The regulation set forth in this part describes current good manufacturing practices for methods used in, and the facilities and controls used for, the manufacture, packing, storage, and installation of all finished devices intended for human use. The regulation is intended to assure that such devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act. Part 820 establishes basic requirements applicable to finished devices, including additional requirements for critical devices.

The preamble to these regulations states, in part:

> The Commissioner believes that an "umbrella" GMP regulation applicable to all finished device manufacturers should not be so specific as to prescribe for each manufacturer the precise details of what it must do and how it must undertake to manufacture devices.
>
> . . . .

> ... This flexible approach enables manufacturer [sic] to exercise judgment in determining which specifications and/or processing procedures for a particular device need to be established, implemented, and controlled.

43 Fed.Reg. 31,508, 31,519 (July 21, 1978).

The GMP regulations require that "[e]ach manufacturer shall prepare and implement quality assurance procedures adequate to assure that a formally established and documented quality assurance program is performed." Section 820.20.

The GMP regulations require that Laerdal Manufacturing undertake "all activities necessary to assure and verify confidence in the quality of the process used to manufacture a finished device," Section 820.3(n), and "prepare and implement a quality assurance program that is appropriate to the specific device manufactured and meets the requirements of this part." Section 820.5.

■ The court agrees with Laerdal Manufacturing that the GMP regulations do not prescribe each particular step required of Laerdal Manufacturing in order for it to comply with these regulations. The court agrees with the United States, however, that the GMP regulations require Laerdal Manufacturing to establish and to maintain a quality assurance program which is consistent with current industry standards in order to meet the minimum requirements set forth in the GMP regulations.

■ In order to establish that Laerdal Manufacturing has violated the GMP regulations, the United States must prove by a preponderance of the evidence that the quality assurance program prepared and implemented by Laerdal Manufacturing is not adequate to assure and verify confidence in the quality of the process used by Laerdal Manufacturing to manufacture the automated external defibrillators or that a specific minimum requirement set forth in the GMP regulations is inadequate or missing from the quality assurance program of Laerdal Manufacturing.

■ The United States relies upon the testimony of its expert witness, Anita Thi-

beault, to support its position that Laerdal Manufacturing has violated certain provisions of the GMP regulations. The court finds Thibeault to be a credible expert witness. However, the weight that the court gives to her testimony is necessarily limited because the information that she was given to rely upon was incomplete. Furthermore, her review of the procedures followed by Laerdal Manufacturing was limited.

Thibeault based her opinions exclusively upon information obtained by an investigator for the FDA at the time of the inspection conducted in September and October of 1993. This was information which was gathered to support the position of the United States in this litigation. Thibeault did not review all of the procedures of the quality assurance system and did not visit the facility or verify the completeness of the records upon which she relied. In addition, Thibeault did not and could not have considered in her opinion changes made to the quality assurance procedures at Laerdal Manufacturing after the inspection conducted in October and November of 1993 and prior to the time of trial.

Laerdal Manufacturing and Karpowicz rely upon the testimony of the expert witness retained by them, David M. Link, and the quality assurance manager of Laerdal Manufacturing, Kenneth B. Herland, in support of their position that Laerdal Manufacturing has now, and has had in the past, adequate quality assurance practices and procedures that comply fully with the GMP regulations. Link was a credible expert witness. However, the weight that the court gives to his testimony is limited because of his opinion that progress in quality assurance principles since the GMP regulations were adopted in 1978 is not reflected in the current good manufacturing practices required by the GMP regulations.

Herland testified that since August of 1993, Laerdal Manufacturing, notwithstanding its belief that its quality assurance procedures were adequate, has implemented a number of changes and refinements to its quality assurance procedures in response to suggestions from consultants and in response to concerns raised by the FDA in order to further improve its quality assurance system.

The record reflects that Laerdal Manufacturing made the following changes to its quality assurance procedures after the complaint in this case was filed on September 15, 1993:

(1) On September 24, 1993, a "Failure Modes and Effects Analysis (FMEA) Procedure" was adopted, and on October 22, 1993 and November 19, 1993, revisions to this procedure were made. (Pl.Ex. 9).

(2) On September 24, 1993, a "Failure Mode, Effects and Criticality Analysis (FMECA) Procedure" was adopted, and on October 22, 1993, November 19, 1993, and February 1, 1994 revisions to this procedure were made. (Def.Ex. 258).

(3) On October 6, 1993, a "Process Validation" procedure was adopted. (Pl.Ex. 8).

(4) On October 6, 1993, an "Internal Audit Procedure" was adopted, and on November 19, 1993 revisions to this procedure were made. (Pl.Ex. 11).

(5) On October 6, 1993, a "Process/Product Validation" procedure was adopted, and on January 25, 1994, revisions to this procedure were made. (Def.Ex. 147).

(6) On January 12, 1994, a "Documentation Control Procedure" was adopted, and on February 8, 1994, revisions to this procedure were made. (Def.Ex. 158).

(7) On September 24, 1993, a "Failure Report, Analysis and Corrective Action (FRACA) Procedure" was adopted, and on October 8, 1993, revisions to this procedure were made. (Pl.Ex. 10).

(8) On September 7, 1993, an "Incoming Inspection Procedure" was adopted, and on September 13, 1993 and October 8, 1993, revisions to this procedure were made. (Pl. Ex. 6).

(9) Revisions were made to the "Identification and Handling of Critical Components" procedure on September 17, 1993, October 8, 1993, and October 21, 1993. (Pl.Ex. 7).

(10) Revisions were made to the "Medical Device Reporting Procedure" on October 8, 1993 and November 19, 1993. (Def.Ex. 145).

(11) Revisions were made to the "Vendor Audit and Approval Procedure" on Septem-

ber 13, 1993, October 8, 1993, and November 19, 1993. (Def.Ex. 143).

(12) Revisions were made to the "Personnel Training Program" on October 6, 1993, November 22, 1993, and January 25, 1994. (Def.Ex. 111).

(13) Revisions were made to the "Customer Contact and Product Service Procedure" on September 24, 1993, October 18, 1993, October 22, 1993, October 27, 1993, November 23, 1993, and January 11, 1994. (Def.Ex. 101).

(14) Revisions were made to the "Processing and Reprocessing Procedure" on October 13, 1993 and December 31, 1993. (Def.Ex. 107).

(15) Revisions were made to the "Label Inspection Master/Incoming Inspection Requirement" procedure on October 4, 1993 and November 22, 1993. (Def.Ex. 104).

(16) Revisions were made to the "Circuit Board Assembly Procedure" on October 7, 1993 and December 30, 1993. (Def.Ex. 109).

These additional procedures were introduced into evidence and are relevant in response to the position of the United States that it is necessary for this court to order Laerdal Manufacturing to cease the manufacture and the distribution of defibrillators until such time as the FDA has determined that Laerdal Manufacturing has complied with the GMP and MDR regulations.

The United States, in rebuttal, presented the testimony of the designated representative of the FDA, William O'Connell. O'Connell's testimony was offered to discredit the evidence submitted by Laerdal Manufacturing that the additional procedures it had instituted after August, 1993 had further improved its quality assurance system. O'Connell failed to address the issues before the court and provided no credible evidence to the case presented by the United States.

1. *21 C.F.R. § 820.20(a)(3)*

21 C.F.R. § 820.20(a) provides that "[t]he quality assurance program shall consist of procedures adequate to assure that the following functions are performed: ... (3) Identifying, recommending, or providing so-

lutions for quality assurance problems and verifying the implementation of such solutions."

Thibeault testified for the United States that the manufacturing practices and procedures of Laerdal Manufacturing do not comply with 21 C.F.R. § 820.20(a)(3). Thibeault testified that the documents that she had reviewed showed examples of failures or problems which had been brought to the attention of Laerdal Manufacturing but which had not been solved. As an example, Thibeault described a situation involving bent leads in which Thibeault concluded that there was no verification that Laerdal Manufacturing had implemented the action that was necessary in order to correct the problem or that the action, if it had been taken, would have corrected the problem.

Laerdal Manufacturing argues that the testimony of Thibeault is not adequate to establish that it violated any of the GMP regulations or that Thibeault failed to reveal the problem with the bent leads in her deposition testimony. Laerdal Manufacturing contends that its quality assurance program adequately verifies the implementation of solutions to quality assurance problems through its documentation control procedure, training procedure, and internal audit procedure.

The evidence in this record does not establish by a preponderance of the evidence that the quality assurance program of Laerdal Manufacturing does not comply with 21 C.F.R. § 820.20(a)(3). The example of the bent leads relied upon by Thibeault does not satisfy this court that the procedures currently in place are not adequate to identify, recommend or provide solutions for quality assurance problems and to verify the implementation of such solutions. The evidence presented by Laerdal Manufacturing through the testimony of Herland shows that the current procedures of Laerdal Manufacturing are adequate to meet the requirements of the regulation.

2. *21 C.F.R. § 820.20(a)(4)*

21 C.F.R. § 820.20(a) provides that "[t]he quality assurance program shall consist of procedures adequate to assure that the fol-

lowing functions are performed: ... (4) Assuring that all quality assurance checks are appropriate and adequate for their purpose and are performed correctly."

Thibeault testified that the manufacturing practices and procedures of Laerdal Manufacturing do not comply with 21 C.F.R. § 820.20(a)(4). Thibeault testified that the documents she had reviewed showed that some units had failed final tests; that there was no explanation of why they had failed final tests; and that such units were retested.

Laerdal Manufacturing presented evidence that its Incoming Inspection procedure, Failure Analysis procedure, and Document Control procedure assure that all quality assurance checks are appropriate and adequate for their purposes.

The court concludes that the evidence in the record does not establish that the procedures currently in effect at Laerdal Manufacturing are not adequate to comply with 21 C.F.R. § 820.20(a)(4). The records that Thibeault reviewed in order to formulate her opinion were not complete, and the evidence presented is not adequate to carry the burden of the United States to prove by a preponderance of the evidence that Laerdal Manufacturing has violated 21 C.F.R. § 820.-20(a)(4).

### 3. 21 C.F.R. § 820.100(a)

21 C.F.R. § 820.100 states, in relevant part:

Written manufacturing specifications and processing procedures shall be established, implemented, and controlled to assure that the device conforms to its original design or any approved changes in that design.

(a) *Specification controls.* (1) Procedures for specification control measures shall be established to assure that the design basis for the device, components, and packaging is correctly translated into approved specifications.

(2) Specification changes shall be subject to controls as stringent as those applied to the original design specifications of the device. Such changes shall be approved and documented by a designated individual(s) and shall include the approval date and the date the change becomes effective.

Thibeault testified that the manufacturing practices and procedures of Laerdal Manufacturing do not comply with 21 C.F.R. § 820.100(a). In support of her opinion, Thibeault testified that she reviewed numerous documents relating to improper or cracked soldering on some of the battery pin connectors. These documents were from the service records of Laerdal Manufacturing and from the histories of individual defibrillator units. Thibeault testified that the process controls of Laerdal Manufacturing, as they appear in Laerdal Manufacturing procedures, are deficient. Thibeault testified that information in the contact reports from customers indicates to Laerdal Manufacturing that something in its manufacturing process is not being controlled. Thibeault testified that the procedures used by Laerdal Manufacturing, including those procedures used in the manufacture of the devices, may not be appropriate for what they are intended to do. Thibeault explained that validation of process is done in order to understand what factors may affect the manufacturing process, but that she had not, in her review of documents, seen any reports relating to the validation of the process used by Laerdal Manufacturing.

Laerdal Manufacturing presented evidence in its case-in-chief that its procedure for documentation control adopted in January, 1994 and its procedure for product and process validation adopted in October, 1993 adequately assure that the design basis for the automated external defibrillators, components and packaging are correctly translated into approved specifications and adequately address the requirements of 21 C.F.R. § 820.-100(a).

Herland testified that prior to the recent additions to the procedure for documentation control adopted in January, 1994 and the procedure for product and process validation adopted in October, 1993, Laerdal Manufacturing formally reviewed and approved all changes and documented the review in an engineering change order. Herland explained that the recent addition of the proce-

dure for documentation control and the procedure for product and process validation "require a more sophisticated, if you will, form of documentation, so that we compile and keep all of our documents in one location now, with regards to these engineering change orders. And they also require that they follow a format that's more consistent, if you will." T–1463.

The procedure used by Laerdal Manufacturing for documentation control specifies that when a change is approved, it must be documented with the date the change is approved and the date the change is effective. This procedure requires a formal review performed by quality assurance engineering, manufacturing engineering, and design engineering, at a minimum, prior to the approval of the changes.

The evidence presented by the United States is not adequate to carry its burden to prove by a preponderance of the evidence that the procedures used by Laerdal Manufacturing violate 21 C.F.R. § 820.100(a). There is no evidence that Laerdal Manufacturing will not follow the procedure for documentation control adopted in January, 1994 and the procedure for product and process validation adopted in October, 1993.

4. *21 C.F.R. § 820.116(a) and 820.116(b)*

21 C.F.R. § 820.116 provides:

In addition to the requirements of § 820.115, the following requirements apply to critical devices:

(a) *Reprocessing procedures.* There shall be written procedures for any reprocessing associated with the production of a critical device or component. These procedures shall prescribe the equipment to be used in reprocessing and shall include any special quality assurance methods or tests. The procedures shall be designed so that the reprocessed device or component meets the original, or subsequently modified and approved, specifications. The procedures shall be designed to prevent adulteration, e.g., because of material, structural, or molecular change in the device or component due to reprocessing. Special care shall be taken to assure that the device or component to be reprocessed is clearly identified and separated from like devices or components not to be reprocessed. When there is constant reprocessing of a device or component, a determination of the effect of the reprocessing upon the device or component shall be made and documented. There shall be a formal approval procedure for instituting a new, or altering an approved, reprocessing procedure.

(b) *Reprocessing control.* Any critical device or component subject to reprocessing procedures shall conform to the original, or subsequently modified and approved, specifications. Written testing and sampling procedures to assure such conformity shall be contained or referenced in the device master record. Any prior quality assurance check shall be repeated on the reprocessed device or component if the reprocessing could adversely affect any performance characteristic previously inspected.

Thibeault concluded from her review of the records that the manufacturing practices of Laerdal Manufacturing do not comply with 21 C.F.R. § 820.116. Thibeault concluded from the documents that the reprocessing was not standardized, and that there had been no effort to ensure that the reprocessing did not induce other problems. Thibeault presented as examples of the failure to comply with 21 C.F.R. § 820.116 the action of Laerdal Manufacturing relating to the soldering of the battery pin connectors and bent leads. Thibeault testified that there was not enough information in the documentation to ascertain the specific steps which are necessary to understand the potential impact of the reprocessing.

Laerdal Manufacturing presented evidence that it has written procedures which govern the process of reprocessing which is associated with the production of any automated external defibrillator or any critical medical component.

The testimony of Thibeault that there was not enough information in the documentation that she reviewed to ascertain the specific steps which are necessary to understand the potential impact of the reprocessing is not

adequate to show by a preponderance of the evidence that the procedures for processing and reprocessing, along with associated procedures, do not comply with 21 C.F.R. § 820.116.

5. *21 C.F.R. § 820.161 and 21 C.F.R. § 820.162*

21 C.F.R. § 820.160 addresses investigations of finished devices. This section states:

> There shall be written procedures for finished device inspection to assure that device specifications are met. Prior to release for distribution, each production run, lot or batch shall be checked and, where necessary, tested for conformance with device specifications. Where practical, a device shall be selected from a production run, lot or batch and tested under simulated use conditions. Sampling plans for checking, testing, and release of a device shall be based on an acceptable statistical rationale. Finished devices shall be held in quarantine or otherwise adequately controlled until released.

21 C.F.R. § 820.161 addresses investigations of finished devices which have not yet been released to customers. This section states:

> In addition to the requirements of § 820.160, the following requirement applies to critical devices: A critical device or component which does not meet its performance specifications shall be investigated. A written record of the investigation, including conclusions and followup, shall be made. A critical device shall not leave the control of the manufacturer for distribution until all acceptance records and test results have been checked by a designated individual(s). Such individual(s) shall assure that all records and documentation required for the device history record are present and complete, and show that release of the device was consistent with the release criteria. Such individual(s) shall authorize, by signature, the release of the device for distribution.

21 C.F.R. § 820.162 addresses investigations of finished devices which have been released to customers. This section states:

> After a device has been released for distribution, any failure of that device or any of its components to meet performance specifications shall be investigated. A written record of the investigation, including conclusions and followup, shall be made.

Thibeault testified that she concluded from her review of the records that the investigations of finished devices which have not been released to customers and of finished devices which have been released to customers of Laerdal Manufacturing are not adequate to comply with 21 C.F.R. § 820.161 and 21 C.F.R. § 820.162. In addition, the United States presented the testimony of Eugene O'Brien, an electronics engineer employed at the FDA. O'Brien testified that he reviewed the documents obtained by the FDA in the course of the inspections and concluded that the investigations conducted by Laerdal Manufacturing relating to failures of the HS3000 keyboard label were inadequate.

The procedure of Laerdal Manufacturing sets forth the general requirements for conducting each investigation. The results of any investigation of a device failure must be reflected in written records. There is no evidence in this record to support the claim of the United States that the procedures used by Laerdal Manufacturing for inspections of finished devices or the procedures used by Laerdal Manufacturing for investigating a finished device or component which does not meet its specifications are not adequate or not being followed by Laerdal Manufacturing.

6. *21 C.F.R. § 820.198*

21 C.F.R. § 820.198 states, in relevant part:

> (a) Written and oral complaints relative to the identity, quality, durability, reliability, safety, effectiveness, or performance of a device shall be reviewed, evaluated, and maintained by a formally designated unit. This unit shall determine whether or not an investigation is necessary. When no investigation is made, the unit shall maintain a record that includes the reason and the name of the individual responsible for the decision not to investigate.

(b) Any complaint involving the possible failure of a device to meet any of its performance specifications shall be reviewed, evaluated, and investigated. Any complaint pertaining to injury, death, or any hazard to safety shall be immediately reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint file.

(c) When an investigation is made, a written record of each investigation shall be maintained by the formally designated unit identified in paragraph (a) of this section. The record of investigation shall include the name of the device, any control number used, name of complainant, and reply to complainant.

Thibeault testified that her review of the records showed that complaints were often not handled as required by 21 C.F.R. § 820.-198 in that complaints were not substantiated, investigated, documented or followed-up. The United States acknowledged at trial that Laerdal Manufacturing contends that it is now in compliance with 21 C.F.R. § 820.198, and that there will be no future violations. The United States argues, nonetheless, that this claim of compliance cannot be verified without an additional inspection by the FDA.

The court is satisfied from the evidence presented at the trial by Laerdal Manufacturing that it has a complaint procedure adequate to comply with the GMP regulations. The record is not adequate for this court to find that Laerdal Manufacturing is presently violating 21 C.F.R. § 820.198.

The task that the court has in resolving the issues in this case is complicated by the fact that changes and additions have been and are being made to the quality assurance procedures at Laerdal Manufacturing. The United States asks this court to impose a single remedy—an order that Laerdal Manufacturing cease the manufacture and the distribution of its defibrillators until such time as the FDA has determined that the operations of Laerdal Manufacturing comply with all of the GMP regulations. Such a remedy, however, would only be imposed by the court if an evaluation of the current procedures warrants such a remedy.

The court finds that there is no evidence that the ongoing changes being implemented at Laerdal Manufacturing are risking the public health. There is not sufficient evidence to prove that the procedures currently in effect at Laerdal Manufacturing do not meet the requirements of the GMP regulations. The United States stated at the time of trial that it is unable to evaluate the most recent changes without an inspection. This court would expect the FDA to conduct such an inspection.

The United States further asserted at trial that the event that occurred on June 16, 1993 in Grand Rapids, Michigan involving an HS1000 defibrillator manufactured by Laerdal Manufacturing demonstrates one of the failures of Laerdal Manufacturing to comply with the GMP regulations and quality assurance principles.

On June 16, 1993, the Grand Rapids Fire Department responded to an emergency call and found a man in cardiac arrest. Fire Department personnel attached a Laerdal HS1000 unit to the man and affixed the electrode pads. The defibrillator indicated that no shock was advised. No shock was administered. Additional medical support teams arrived sometime later, and paramedics attempted unsuccessfully to resuscitate the patient using a different defibrillator.

Fire Department personnel later printed the tape containing the record of the heart rhythms of the man and sent the tape to the clinical investigator for Laerdal Manufacturing for evaluation.

The HS1000 defibrillator of Laerdal Manufacturing involved in the Grand Rapids incident on June 16, 1993 was returned to Laerdal Manufacturing twice after that incident. The first time that the unit was returned to Laerdal Manufacturing, the computer chips containing the software program were replaced, and the unit was then returned to the Grand Rapids Fire Department. When the unit was returned to Laerdal Manufacturing a second time, the clinical investigator for Laerdal Manufacturing determined that the cardiac rhythm recorded on the tape of the incident presented ventricular fibrillation of an amplitude of .4 to .6 millivolts. The clini-

cal investigator played the tape from the incident five times, and on every occasion, the quality assurance unit detected ventricular fibrillation and delivered a shock based upon the rhythm presented.

At trial, the United States presented the testimony of two medical experts whose opinions were that the heart rhythm presented on the tape was the rhythm of ventricular fibrillation, a rhythm that should have induced a shock. Laerdal Manufacturing presented a medical expert who testified that in his opinion the rhythm presented on the tape was a borderline rhythm between asystole and ventricular fibrillation, and that the HS1000 defibrillator of Laerdal Manufacturing did not malfunction during the incident.

A second incident took place in Houston, Texas on May 22, 1993. In the incident in Houston, Texas on May 22, 1993, an HS1000s defibrillator manufactured by Laerdal Manufacturing was attached to a patient whose heart was in ventricular fibrillation. The HS1000s defibrillator shocked the patient, and the patient's heart was converted to what appeared on the tape to be a normal sinus rhythm. However, the defibrillator then identified what appeared to be a normal rhythm as a shockable rhythm and delivered a second shock.

The Houston Fire Department contacted Laerdal Manufacturing about this incident, and Laerdal Manufacturing investigated.

At trial, medical experts for the United States testified concerning the Houston incident that the patient's heart rhythm between the first shock and the second shock was a normal sinus rhythm and that the second shock should not have been delivered. The medical expert for Laerdal Manufacturing testified concerning the Houston incident that the patient's heart rhythm between the first shock and the second shock contained artifact from some source which interfered with the ability of the HS1000s defibrillator to detect the underlying rhythm, and that the artifact caused the second shock and not a failure of the HS1000s defibrillator.

The United States contends that these two incidents demonstrate the inherent unreliability of the devices of Laerdal Manufactur-

ing and the failure of the quality assurance system used by Laerdal Manufacturing in manufacturing the devices.

Laerdal Manufacturing contends that the devices did not malfunction, and that these incidents demonstrate accepted limitations of the technology of all AEDs. Laerdal Manufacturing argues that the reliability of its devices, when that reliability is measured by overall performance, confirms that Laerdal Manufacturing has an adequate quality assurance system.

While the testimony and exhibits relating to the two incidents was a large part of the presentation of evidence and argument at trial, this case is not a products liability case, and this court need not determine whether the units involved in these incidents malfunctioned. The court cannot conclude that the quality assurance program of Laerdal Manufacturing does or does not comply with the GMP regulations based upon these two incidents. The evidence relating to the performance of the HS1000 defibrillator in Grand Rapids, Michigan and to the HS1000s defibrillator in Houston, Texas is considered only as it relates to specific allegations of violations of the GMP regulations, the MDR regulations, and the misbranding claims.

There was evidence at trial that the Grand Rapids incident demonstrated a failure of Laerdal Manufacturing to provide in its formal complaint procedure for an investigation of any unit which is returned for transcription and review of the tape. The Customer Contact and Product Service Procedure of Laerdal Manufacturing was revised on January 11, 1994 to specifically provide that a contact report must be completed "for any customer contact that relates to a complaint, request for service, or a tape/MCM returned for transcription and review." Def.Ex. 101, p. 2, Section 5.2.

The timing of the revision on January 11, 1994 is subject to criticism, but the problem addressed is no longer a basis for the United States to argue that the quality assurance program of Laerdal Manufacturing is in violation of the GMP regulations. There is no evidence from which this court could conclude that Laerdal Manufacturing will disre-

gard the change it has made in its procedures on January 11, 1994.

The court has carefully reviewed the testimony and exhibits relating to the allegations of the United States of past GMP violations by Laerdal Manufacturing and the potential for future violations by Laerdal Manufacturing. This evidence shows that the quality assurance procedures at Laerdal Manufacturing have been significantly examined and revised from April of 1993, when the Director of Quality Assurance was hired, to and including the start of the trial in this case. This litigation has been the cause of significant improvement in the quality assurance procedures at Laerdal Manufacturing.

■ The evidence presented by the United States is not adequate to meet the burden of the United States to prove by a preponderance of the evidence that past and/or possible future violations of the GMP regulations require that this court order Laerdal Manufacturing to cease the manufacture and the distribution of its defibrillators until such time as the FDA has determined that the operations of Laerdal Manufacturing in Tualatin, Oregon comply with all of the GMP regulations.

*Alleged Violations of the MDR Regulations*

A device is deemed misbranded under 21 U.S.C. § 352(t) "[i]f ... there was a failure or refusal ... (2) to furnish any material or information required by or under section 360i of this title respecting the device." 21 U.S.C. § 360i authorizes the Secretary of Health and Human Services to prescribe regulations that are reasonably required to ensure that medical devices are not adulterated or misbranded and are both safe and effective. Specifically, section 360i requires that the manufacturers, importers and distributors of medical devices make such reports and provide such information to the FDA as that agency requires by regulation.

The Medical Device Reporting (MDR) regulations, 21 C.F.R. Part 803, require the manufacturer of medical devices, including Laerdal Manufacturing, to report to the FDA whenever the manufacturer:

receives or otherwise becomes aware of information that reasonably suggests that one of its marketed devices (1) may have caused or contributed to a death or serious injury or (2) has malfunctioned and that the device or any other device marketed by the manufacturer ... would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

21 C.F.R. § 803.1(a).

Under the MDR regulations, the manufacturer of a medical device who receives information that reasonably suggests that the device may have caused or contributed to a death or serious injury is required to notify the FDA by telephone within five calendar days of receiving the information and is required to file a written report concerning the death or serious injury within fifteen working days of receipt of such information.

The MDR regulations further provide that the manufacturer of a medical device is required to submit a written report to the FDA within fifteen working days of receipt of information that reasonably suggests that the device may have malfunctioned and that, if the malfunction was to recur, it is likely that the device may cause or contribute to a death or serious injury. 21 C.F.R. § 803.24.

The United States presented evidence at trial that during the summer of 1993 personnel of Laerdal Manufacturing became aware of the Grand Rapids incident which occurred on June 16, 1993 and became aware that the Grand Rapids incident involved a death.

Laerdal Manufacturing contends that the United States did not show that it had violated the MDR regulations by not filing a report on the Grand Rapids incident because the testimony of Clarence Wilson, an employee of the FDA, was not credible and his testimony is not adequate to establish a violation of the MDR regulations. In addition, Laerdal Manufacturing argues that the FDA investigator concluded during the inspection conducted in October and November of 1993 that the information regarding the death in the Grand Rapids incident was "indefinite." Def.Ex. 213, p. 1. Laerdal Manufacturing asserts that it did not have information reasonably suggesting that its automated exter-

nal defibrillator "caused or contributed to" the death.

Laerdal Manufacturing contends that its medical device reporting procedure incorporates the standards in the MDR regulations, and that there is no evidence of a violation of the MDR regulations.

The United States contends that the records of Laerdal Manufacturing show inconsistency in MDR reporting which has resulted in violations of the MDR regulations. The United States contends that Laerdal Manufacturing deliberately chose not to submit an MDR report for the Grand Rapids incident and only reversed that decision two weeks before the trial of this case. The United States contends that the record shows repeated failures on the part of Laerdal Manufacturing to file the required MDR reports.

At the trial, the quality assurance reliability engineer (QA reliability engineer) for Laerdal Manufacturing, testified that as a part of his job duties he has "some responsibility with regard to determinations as to whether Laerdal will file medical device reports with FDA." T–519. The QA reliability engineer is involved in the investigation of customer complaints and maintains a database within Laerdal Manufacturing regarding customer complaints and service requests. The QA reliability engineer testified that Laerdal Manufacturing has had reported complaints of machines that have allegedly delivered shocks when they should not have and complaints where the machine failed to detect and treat ventricular fibrillation. T–524.

The QA reliability engineer learned of the Grand Rapids incident from the clinical investigator for Laerdal Manufacturing in the summer of 1993 after the clinical investigator had received the tape of the incident which had been sent to Laerdal Manufacturing for transcription. The clinical investigator for Laerdal Manufacturing testified that she reviewed the tape provided by the Grand Rapids Fire Department; that she concluded that the heart rhythm of that patient was ventricular fibrillation; and that the unit identified no positive treatable segments during the assess period for the original inci-

dent. The clinical investigator noted in a memorandum dated July 20, 1993: "A Medical Control Unit (MCU) was used to playback the ECG from the [Grand Rapids] incident into the QA HS1000s, serial number 1489. The QA HS1000 device charged and 'committed to treat' in five out of five of the replays." Pl.Ex. 167, p. 18. The clinical investigator recommended further investigation.

Further investigation was made by Laerdal Manufacturing.

Laerdal Manufacturing submitted an MDR report to the FDA on February 4, 1994.

Karpowicz testified at trial that the ultimate responsibility for the decision not to file an MDR report for the Grand Rapids incident was his, but that the actual decision was made by "Mr. Herland, Mr. Egner, and counsel." T–1198. Karpowicz testified that "the review of the Grand Rapids incident was made several times, because the—there was never a clear-cut decision, until after the Grand Rapids incident was raised as an issue in the October, November inspection, because there had never been a complaint reported to us by Grand Rapids." T–1199.

Karpowicz testified that he was not aware of the Grand Rapids incident and the decision not file an MDR report until after the inspection conducted in October and November, 1993. Karpowicz testified that the clinical investigator was aware of the Grand Rapids incident during the summer of 1993, and that it was the concern of the clinical investigator that a patient in ventricular fibrillation had not been shocked by the device.

Kenneth Herland, the Director of Quality Assurance, testified that Laerdal Manufacturing submitted the MDR on the Grand Rapids incident on February 4, 1994 in order to resolve the issue with the FDA. Herland stated:

My understanding of this particular incident is—is that personally I don't think we should have submitted an MDR, because it's my understanding, as I understand the facts, that the device actually wasn't in use at the time of this incident. Another device was involved with it. And that's my understanding with this incident.

But, again, to be cooperative and in a cooperative effort here, we felt that we should submit it.

T–1556.

The Medical Device Reporting procedure used by Laerdal Manufacturing was originated on March 2, 1992 by the QA reliability engineer. The Medical Device Reporting procedure states that a medical device report is a:

A report submitted to the FDA whenever information is received that reasonably suggests that a patient care device:

1. May have caused or contributed to a death or serious injury, or
2. Has malfunctioned and if the malfunction recurs, would be likely to cause or contribute to a death or serious injury.

Def.Ex. 145, p. 1, Section 4.1.

This procedure was revised on August 17, 1993 to "ADD REPORTING CRITERIA;" revised on October 8, 1993 to "REVISE 5.4, 5.5 AND 5.6," which do not appear in the current procedure; and revised on November 19, 1993 for "CLARIFICATION OF RESPONSIBILITY." *Id.* The current procedure revised as of November 19, 1993 states at Section 5.1 that "[e]nforcemnt [sic] of the requirements of this procedure shall be the responsibility of the Director of Quality Assurance or designee." *Id.*

Section 6.4 of the Medical Device Reporting procedure of Laerdal Manufacturing states, in part, that "[i]f a report describes an event in which a device may have caused or contributed to a death or serious injury, a report will be made to the FDA by telephone as soon as possible, but no later than 5 calendar days after the initial receipt of the information." Def.Ex. 145, p. 2. This procedure is mandated by the MDR regulations. The regulation and the reporting procedure adopted by Laerdal Manufacturing do not require that the event be reported as a "complaint." The regulation and the reporting procedure adopted by Laerdal Manufacturing do not require that the findings be more than "indefinite" when reported.

The MDR regulations require Laerdal Manufacturing to submit an MDR report when any of the various company personnel are informed of events which *"may* have caused or contributed to a death." 21 C.F.R. § 803.1(a). In the case of the Grand Rapids incident, the clinical investigator and the QA reliability engineer were informed in the summer of 1993 that a device manufactured by Laerdal Manufacturing was involved in treatment events in which a death occurred; that the device did not shock the patient during the incident; and that the device did commit to shock in five out of five replays into a quality assurance device after the incident. This information supports the conclusion that the device "may have caused or contributed to a death." An MDR report was not submitted until February 4, 1994, and then only to be cooperative with the FDA because the Director of Quality Assurance still felt that a report was not required.

There is testimony in the record that Laerdal Manufacturing has had other reported complaints of devices that have allegedly delivered shocks when they should not have and complaints where the device failed to detect and to treat ventricular fibrillation.

■ Assuming that the Medical Device Reporting procedure adopted by Laerdal Manufacturing is adequate because it states the requirements of the MDR regulations, it is not being implemented by Laerdal Manufacturing, and at least one violation of the MDR regulations has occurred.

The court will order that:

... defendants, Laerdal Manufacturing Corporation, a corporation, and John L. Karpowicz, an individual, and each and all of their officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them, or any of them, be perpetually restrained and enjoined from directly or ·indirectly ...

. . . .

... Failing or refusing to furnish information required by or under 21 U.S.C. § 360i, in accordance with the MDR regulation, Part 803.

Amended Complaint for Injunction, pp. 7–8.

The court will not order Laerdal Manufacturing to cease its manufacturing activities

since compliance with the order of this court can only be demonstrated through continued operations. Furthermore, the court is satisfied that Laerdal Manufacturing will comply with the order of this court and the MDR regulations. The FDA will need to conduct reasonable inspections of the Laerdal Manufacturing facility in order to determine whether all required events are being reported in contact reports and to determine whether all contact reports are being properly evaluated as to whether an MDR report should be filed with the FDA.

### Alleged Labeling Violations

■ 21 U.S.C. § 352(j) of the Act provides that a device shall be deemed to be misbranded "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

The United States contends that the inspection of Laerdal Manufacturing conducted in October and November of 1993 uncovered two hazardous events involving the HS1000 and the HS1000s defibrillators of Laerdal Manufacturing which have been described earlier in this opinion and referred to as the Grand Rapids incident and the Houston incident.

The United States argues that it has established through the testimony of its expert witnesses and the testimony of employees of Laerdal Manufacturing that the HS1000 and HS1000s defibrillators are dangerous to the health of a patient because they can shock inappropriately and cause potentially lethal heart rhythms, and because the devices can fail to defibrillate ventricular fibrillation when depended upon to do so by users in accordance with the labeling and operating instructions of the devices.

Laerdal Manufacturing contends that the claim by the United States that its HS1000 and HS1000s defibrillators are dangerous when used in accordance with the labeling or operating instructions is not supported by the evidence in this record. Laerdal Manufacturing contends that the operating instructions caution, in every instance, that the device will administer a shock only "[i]f ven-

tricular fibrillation ... is detected," Def.Ex. 201, p. 1, and that there is no evidence that these instructions are misleading. Laerdal Manufacturing further contends that the evidence as to the Grand Rapids incident and the Houston incident does not demonstrate that its HS1000 and HS1000s are "dangerous to health" regardless of what the labeling states.

The operating instructions of the HS1000 and the HS1000s of Laerdal Manufacturing state that these devices contain an arrhythmia analysis system referred to as an algorithm which is based upon the amplitude, slope and frequency of the cardiac rhythm presented during the relevant period of time. The operating instructions state that the devices will administer a shock if ventricular fibrillation is detected. The court finds that these operating instructions are not misleading.

The evidence presented at the trial as to the Grand Rapids incident shows that the device did not detect ventricular fibrillation from the rhythm presented by the patient and did not administer a shock. The evidence presented at the trial as to the Houston incident shows that the device failed to detect a normal sinus rhythm after the device had accurately detected ventricular fibrillation and had administered the first shock, and therefore administered a second shock. These events, however, do not provide any basis for the court to conclude that the operating instructions are misleading. These events may provide some basis for concluding that the algorithm is not without error in committing to treat or not to treat. However, the operating instructions do not make any representations as to the accuracy of the algorithm. There is no evidence in this record that the labeling for the HS1000 and the HS1000s of Laerdal Manufacturing is inaccurate or improper.

The court finds in favor of Laerdal Manufacturing and against the United States on the claim of the United States that the HS1000 and the HS1000s defibrillators of Laerdal Manufacturing are misbranded within the meaning of 21 U.S.C. § 352(j).

*Other Issues*

The court further finds that there was no oral agreement to settle this case. Furthermore, the court finds that there is no evidence that any of the FDA regulations involved in this case or any of the actions taken by the FDA in this case are outside of the authority of the FDA.

## CONCLUSION

This court has reviewed the testimony, the exhibits, and the arguments presented in this case. The parties have a duty to the public and its health to work together so that safe and effective medical devices may be produced. Compliance with government regulations is an ongoing matter.

The court finds that, in light of the changes in the quality assurance procedures made by Laerdal Manufacturing after this action was filed but prior to the time of trial, the United States has not proven by a preponderance of the evidence that the quality assurance program of Laerdal Manufacturing violates the GMP regulations.

The court finds that the United States has proven by a preponderance of the evidence that Laerdal Manufacturing has failed to comply with the MDR regulations. The court will order Laerdal Manufacturing to comply with the MDR regulations.

The court finds that the United States has not carried its burden to show by a preponderance of the evidence that there is reason to believe that Laerdal Manufacturing will in the future violate the MDR regulations or the Act absent an order of this court that Laerdal Manufacturing cease the manufacture and the distribution of its medical devices.

The court will order that:

(1) the motion of the United States for preliminary injunction (# 45) is denied; and

(2) the motion of Laerdal Manufacturing and Karpowicz for partial summary judgment (# 64) is denied.

The court will further order that:

Defendants, Laerdal Manufacturing Corporation, a corporation, and John L. Karpowicz, an individual, and each and all of the officers, agents, servants, employees, and attorneys for Laerdal Manufacturing Corporation, and those persons in active concert or participation with them, or any of them, be perpetually restrained and enjoined from directly or indirectly—

Failing or refusing to furnish information required by or under 21 U.S.C. § 360i, in accordance with the MDR regulation, Part 803.

The court will enter judgment in part for the defendants and in part for the United States and will dismiss the case with the provision that either party may move the court to reopen the case for further proceedings upon a showing that it is in the interests of justice to do so.

Each party shall bear its own fees and costs.